# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE GGP, INC. STOCKHOLDER LITIGATION | ) ) ) | **CONSOLIDATED** **C.A. No. 2018-0267-JRS** |

## MEMORANDUM OPINION

Date Submitted:  February 18, 2021
Date Decided:  May 25, 2021

Ronald A. Brown Jr., Esquire, Stephen D. Dargitz, Esquire, J. Clayton Athey, Esquire, Marcus E. Montejo, Esquire and Samuel L. Closic, Esquire of Prickett Jones & Elliott, P.A., Wilmington, Delaware; Carl L. Stine, Esquire and Adam J. Blander, Esquire of Wolf Popper LLP, New York, New York; and Frank P. DiPrima, Esquire of Law Office of Frank DiPrima, P.A., Morristown, New Jersey, Co-Lead Attorneys for Plaintiffs.

Seth D. Rigrodsky, Esquire and Gina M. Serra, Esquire of Rigrodsky Law, P.A., Wilmington, Delaware and Aaron Brody, Esquire and Patrick Slyne, Esquire of Stull, Stull & Brody, New York, New York, Attorneys for Plaintiffs' Executive Committee.

Kevin G. Abrams, Esquire, John M. Seaman, Esquire and Matthew L. Miller, Esquire of Abrams & Bayliss LLP, Wilmington, Delaware and John A. Neuwirth, Esquire, Evert J. Christensen, Jr., Esquire, Seth Goodchild, Esquire and Matthew S. Connors, Esquire of Weil, Gotshal & Manges LLP, New York, New York, Attorneys for Defendant Brookfield Property Partners L.P.

David J. Teklits, Esquire and Thomas P. Will, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, Attorneys for Defendants Richard Clark, Bruce Flatt and Brian W. Kingston.

Raymond J. DiCamillo, Esquire and Susan M. Hannigan, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware and Brian T. Frawley, Esquire and Y. Carson Zhou, Esquire of Sullivan & Cromwell LLP, New York, New York, Attorneys for Defendant Sandeep Mathrani.

Peter J. Walsh, Jr., Esquire, Berton W. Ashman, Jr., Esquire and Jaclyn C. Levy, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware and Peter E. Kazanoff, Esquire, Michael J. Garvey, Esquire, Sara A. Ricciardi, Esquire and Eamonn W. Campbell, Esquire of Simpson Thacher & Bartlett LLP, New York, New York, Attorneys for Defendants Mary Lou Fiala, Janice R. Fukakusa, John K. Haley, Daniel B. Hurwitz and Christina M. Lofgren.

**SLIGHTS, Vice Chancellor**

"In the beginning there was noise. Noise begat rhythm. And rhythm begat everything else."[1] As a species, human beings are instinctively attracted to rhythm. As a subspecies, corporate litigators are no different. In the realm of Delaware post-closing shareholder litigation, over the past seven years, a rhythm has emerged in the assertion of claims and defenses as our courts have clarified and refined the application of standards for reviewing fiduciary conduct. In hopes of securing more rigorous judicial scrutiny of fiduciary conduct, stockholders invoke the sounds of minority blockholders who act as if they are controlling stockholders, fiduciary decisionmakers who are overcome by allegiances to the controller, and stockholders who are coerced to sell their shares while starved of accurate and complete information. In hopes of securing more judicial deference to fiduciary decision making, defendants invoke the sounds of passive minority blockholders and presumptively disinterested, independent (and often exculpated) fiduciaries who have faithfully served fully informed, uncoerced stockholders. When laid down on the same track, the sounds can be perceived as noise. But to the accustomed ear, there is rhythm.

On August 28, 2018, GGP, Inc. ("GGP" or the "Company") entered into a merger (the "Transaction") with Defendants, Brookfield Property Partners, L.P.

---

[1] Mickey Hart, *Rhythms of the Universe* (360˚ Prod. 2013).

("BPY") and its affiliates (the "Brookfield Affiliates" and, together with BPY, "Brookfield"). Prior to the Transaction, Brookfield owned 35.3% of GGP's shares. As a result of the Transaction, Brookfield acquired all of the Company's shares it did not own in exchange for a combination of cash and either of two forms of equity, representing 61% and 39% of the consideration, respectively. Structurally, the deal consideration would be paid in two parts: (1) a pre-closing dividend of cash and shares, amounting to about 98.5% of the deal consideration (the "Pre-Closing Dividend"), and (2) $0.312 per share in cash at closing, representing the balance of the deal consideration, capped at $200 million.

The Transaction was the culmination of negotiations that began in 2017, when Brookfield extended an offer to GGP's board of directors (the "Board") to acquire the balance of the Company's outstanding shares. As if striking a well-worn key on the piano, Brookfield asked GGP to appoint a committee of independent directors to evaluate the offer and negotiate the Transaction, and clarified that any final deal would "be subject to customary approvals including . . . approval of a majority of the Company's stockholders not affiliated with [Brookfield]."[2] The Board did not miss a beat and appointed a special committee (the "Special Committee") the next

---

[2] Consol. Verified Third Am. S'holder Class Action Compl. (D.I. 109) ("Compl.") ¶ 138; Decl. of Matthew L. Miller, Esq. in Connection with Defs.' Opening Brs. in Supp. of Their Mots. to Dismiss (D.I. 118) ("Miller Decl.") Ex. 4 ("Offer Letter") at 2.

day.  At the same time, the three Board members affiliated with Brookfield, each Defendants here, formally recused themselves from the process.

From November 15, 2017 through March 26, 2018, the date the Merger Agreement was executed, the Special Committee held over thirty meetings to consider Brookfield's various proposals while also evaluating GGP's strategic options.  On June 27, 2018, GGP and Brookfield jointly filed a Proxy soliciting a "yes" vote on the Transaction from GGP's stockholders unaffiliated with Brookfield.  Stockholders resoundingly (by vote of 94% of stockholders unaffiliated with Brookfield) approved.

With the benefit of books and records obtained in an action brought under 8 *Del. C.* § 220,[3] Plaintiffs, three stockholders of GGP, filed this action alleging the Transaction was the product of actionable breaches of fiduciary duties by GGP's Special Committee, its Board and its allegedly controlling stockholder, Brookfield. According to Plaintiffs, if the Court finds they have not well pled that Brookfield was GGP's controlling stockholder, then Brookfield is liable as an aider and abettor of the fiduciary duty breaches committed by GGP's conflicted Board, a majority of whom were beholden to Brookfield.

---

[3] *Kosinski v. GGP Inc.*, 214 A.3d 944 (Del. Ch. 2019) ("220 Decision").

Plaintiffs' allegations, and the defenses to them, summon the familiar rhythm of contemporary stockholder post-closing litigation in standard 4/4 time. In motions to dismiss the Complaint, Defendants answer Plaintiffs' refrain by arguing Brookfield's controller status is not well pled. Brookfield was a minority blockholder who neither controlled GGP generally nor with respect to the Transaction specifically. If the Court agrees it is not reasonably conceivable that Brookfield was GGP's controlling stockholder, then, say Defendants, the defendant fiduciaries are entitled to business judgment deference because an overwhelming majority of GGP stockholders approved the Transaction in an informed, uncoerced vote and thereby "cleansed" any breaches of fiduciary duty. If the Court disagrees, Defendants say all fiduciaries are nonetheless entitled to business judgment deference because the controller's influence was neutralized by a well-functioning, independent special committee of the Board and the informed, uncoerced approval of the Transaction by a majority vote of GGP's minority stockholders. And the beat goes on. . . .[4]

---

[4] I make this point not to belittle the claims or defenses here, but merely to preview that they will be well-familiar to those who follow post-closing stockholder litigation. *See In re Rouse Props., Inc.*, 2018 WL 1226015, at *1 (Del. Ch. Mar. 9, 2018) ("In this post-*Corwin*, post–*MFW* world, a pattern has emerged in post-closing challenges to corporate acquisitions (whether by merger or tender offer) where a less-than-majority blockholder sits on either side of the transaction, but the corporation in which the blockholder owns shares does not recognize him as a controlling stockholder and does not, therefore, attempt to neutralize his presumptively coercive influence. The pattern, in its simplest form,

4

For reasons explained below, I cannot reasonably infer from the Complaint that Brookfield was GGP's controlling stockholder at the time of the Transaction, so *Corwin*, not *MFW*, is the appropriate paradigm under which to determine the applicable standard of review. I have also determined that the Complaint does not well plead that the stockholder vote approving the Transaction was either uninformed or coerced. The upshot is that the business judgment rule is the operative standard of review. Having determined that GGP stockholders were informed when they voted to approve the Transaction, including with respect to their right to seek statutory appraisal, Plaintiffs' claim for quasi-appraisal fails. Having declined to plead waste, Plaintiffs' claims for breach of fiduciary duty against Brookfield, the Board and Mathrani also fail. And, from all of this, it follows that Plaintiffs' claim

---

consists of two elements: (1) the stockholder plaintiff pleads facts in hopes of supporting a reasonable inference that the minority blockholder is actually a controlling stockholder such that the *MFW* paradigm is implicated and the *Corwin* paradigm is not, and (2) failing that, the plaintiff pleads facts in hopes of supporting a reasonable inference that the stockholder vote was uninformed or coerced such that *Corwin* does not apply. Under our settled law, these are two cleared pathways to avoid pleading-stage business judgment deference and to secure post-closing discovery in the wake of a stockholder vote approving a transaction." (citing *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980 (Del. Ch. 2014), *aff'd sub nom. Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015); *In re MFW S'holders Litig.*, 67 A.3d 496 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014)); *see also, e.g.*, *id.* at *1, n.7 (collecting cases where stockholders challenged a merger post-closing by alleging that a minority stockholder was, in fact, a controlling stockholder in hopes of ratcheting up the standard of review from business judgment rule to entire fairness, and then arguing, alternatively, that the stockholder vote approving the merger could not "cleanse" fiduciary duty breaches because stockholders were uninformed or coerced).

5

in the alternative against Brookfield for aiding and abetting fails for lack of a predicate breach of fiduciary duty. Finally, because the Transaction was duly executed, Plaintiffs' unjust enrichment claim against Brookfield fails. Defendants' motions to dismiss, therefore, must be granted in full.

## I. BACKGROUND

I have drawn the facts from the well-pled allegations in Plaintiffs' Consolidated Verified Third Amended Stockholder Class Action Complaint (the "Complaint")[5] and documents integral to it or incorporated by reference.[6]

---

[5] D.I. 109. I acknowledge at the outset that Plaintiffs' Complaint is lengthy, weighing in at 330 paragraphs. But a complaint under our law is scaled not by its physical heft in the hand but rather by the legal substance of its well-pled allegations.

[6] *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting the court may consider on a motion to dismiss documents that are "incorporated by reference" or "integral" to the complaint). Citations in the form of "Proxy __" refer to the Company's Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, filed June 27, 2018, attached as Exhibit 3 to the Miller Declaration at D.I. 118. The Court may take judicial notice of facts not subject to reasonable dispute in documents filed with the SEC, such as the Proxy. *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006). The parties agreed that "all documents and information provided by the Company to the Demanding Party shall be deemed incorporated by reference into the filing." Miller Decl. Ex. 13 (Agreement Governing the Inspection of Confidential Material) ¶ 12; *see also Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 796 (Del. Ch. 2016) (explaining a corporation may condition Section 220 production on stockholder agreement that the "entirety" of the production "is incorporated by reference in any [subsequently filed] complaint").

## A. The Parties and Relevant Non-Parties

Plaintiffs, Randy Kosinski, Arthur Susman and Robert Lowinger, each held GGP shares at the time of the Transaction.[7] They did not vote to support the Transaction.[8]

Defendant, BPY, is a Bermuda limited partnership with headquarters in Hamilton, Bermuda.[9] Its limited partnership units are traded on the NASDAQ and the Toronto Stock Exchange under the symbol "BPY."[10] Brookfield, through BPY and other affiliates, holds a diversified global portfolio of real estate investments, including office, retail, hospitality, industrial and multifamily residential.[11] At the

---

[7] Compl. ¶¶ 22–24.

[8] Compl. ¶ 25.

[9] Compl. ¶ 26.

[10] *Id.*

[11] *Id.* Plaintiffs use "Brookfield" and "BPY" interchangeably and sometimes in conflicting ways throughout the Complaint and briefing. *Compare* Compl. ¶¶ 26, 291–94 (alleging "BPY held a share ownership and voting interest of approximately 35.3% of GGP's outstanding shares," and bringing a claim for breach of fiduciary duty against "BPY" as GGP's controller) *with* Compl. ¶¶ 82, 103 (alleging, under the heading "Brookfield Controlled GGP," that "Brookfield's voting power gave it control of GGP far beyond what its 35.3% voting stake implies" and "[a]t the time of the [Transaction], according to the Proxy, of 958,392,694 shares of GGP outstanding and entitled to vote, 338,336,700 were held by BPY and other Brookfield Affiliates. Thus, Brookfield had voting power of 35.3% . . . ."). Yet these parties are not treated identically under the counts brought in the Complaint. *Compare, e.g.*, Compl. ¶¶ 291–94 (alleging breach of fiduciary duty against BPY) *with* Compl. ¶¶ 318–25 (naming in their unjust enrichment count "Brookfield" and alleging in paragraph 322 that "Brookfield has thus been unjustly enriched, at the expense of Plaintiffs and other members of the Class," but alleging in paragraphs 319 and 325 that

7

time of the Transaction, Brookfield held approximately 35.3% of GGP's outstanding common stock.[12]

Defendant, Richard B. Clark, is Chairman of the boards of directors of Brookfield Property Group, BPY, and Brookfield affiliate BPR REIT (defined herein).[13] He worked at BPY from 1984 through the time of the Transaction, including serving a term as its CEO.[14] In 2010, Brookfield designated Clark to serve on the Board of GGP, a position he held continuously leading up to the Transaction.[15] Between 2010 and the Transaction, Clark was a member of the Nominating and Governance ("N&G") Committee of the GGP Board and served as that committee's chairman between 2011 and 2014.[16]

Defendant, Mary Lou Fiala, was a member of the GGP Board at the time of the Transaction, having served continuously in that capacity since she was

---

"BPY was enriched" and "the Class . . . is entitled to restitution and/or disgorgement from BPY."). For purposes of the Court's analysis, however, the distinction is irrelevant because I ultimately grant Defendants' motions to dismiss in full. Thus, to avoid confusion, unless otherwise indicated, I will refer to BPY and/or any Brookfield affiliate collectively as Brookfield.

[12] Compl. ¶ 26.

[13] Compl. ¶ 27.

[14] *Id.*

[15] *Id.*

[16] *Id.*

designated by Brookfield in November 2010.[17]  Fiala was a member of two standing committees of the Board: the N&G Committee and the Compensation Committee.[18]

Defendant, J. Bruce Flatt, has served as the CEO of BAM since 2002.  BAM is the Brookfield Affiliate with voting control of BPY.[19]  In 2010, Brookfield designated Flatt to the Board of GGP.[20]  As of the time of the Transaction, Flatt served as Chairman of the Board and Chairman of the Board's Compensation Committee.[21]

Defendant, Janice R. Fukakusa, is the former Chief Financial Officer and Chief Administrative Officer of the Royal Bank of Canada ("RBC"), having served in those dual executive capacities for several years until her retirement in 2017.[22]  Fukakusa was a member of the GGP Board from 2017 through the Transaction,

---

[17] Compl. ¶ 28.

[18] *Id.*

[19] Compl. ¶ 29.

[20] *Id.*

[21] *Id.*

[22] Compl. ¶ 30.  Fukakusa was employed by RBC for 32 years from 1985 to 2017.  *Id.*

serving on the Special Committee and Audit Committee.[23] Fukakusa also currently serves as Chancellor of Ryerson University in Toronto, Ontario, Canada.[24]

Defendant, John K. Haley, was a partner in the accounting firm of Ernst & Young LLP from 1988 until his retirement in 2009.[25] Haley was a member of the GGP Board from September 2009 until the Transaction.[26] Like Fiala, Haley was selected by Brookfield to serve as a director of GGP in 2010.[27] Haley was a member of the Special Committee, Chair of GGP's Audit Committee and a member of its Compensation Committee at the time of the Transaction.[28]

Defendant, Daniel B. Hurwitz, is founder and CEO of Raider Hill Advisors, LLC, a real estate investment and retail advisory firm.[29] He previously served as CEO of DDR Corp., an owner and manager of value shopping centers.[30] Hurwitz was a member of the GGP Board at the time of the Transaction, having

---

[23] *Id.*

[24] *Id.*

[25] Compl. ¶ 31.

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] Compl. ¶ 32.

[30] *Id.*

served continuously in that capacity since 2013.[31] He was a member of the GGP Board's Compensation Committee at the time of the Transaction,[32] and also served as chair of the Special Committee.[33]

Defendant, Brian W. Kingston, is Managing Partner and CEO of Brookfield Property Group and of BPY.[34] Kingston was a member of the GGP Board at the time of the Transaction, having served continuously in that capacity since 2013, replacing another Brookfield selection to the GGP Board who had served since 2010.[35] Defendants Clark, Flatt and Kingston were three members of the GGP Board at the time of the Transaction who were designated by BPY, and were at all relevant times senior Brookfield officers (together, the "Brookfield Directors").[36]

Defendant, Christina M. Lofgren, was a manager and later a senior corporate executive of The TJX Companies ("TJX") between 1989 and 2016.[37] Most recently, Lofgren served as Executive Vice President, Real Estate and Property Development

---

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] Compl. ¶ 33.

[35] *Id.*

[36] Compl. ¶ 36.

[37] Compl. ¶ 34.

of TJX.[38]  Lofgren was a member of the GGP Board at the time of the Transaction, having served continuously in that capacity since 2017.[39]  Lofgren was also a member of the Special Committee.[40]

Defendant, Mathrani, was CEO of GGP from 2010 through the time of the Transaction.[41] Mathrani was also a member of the GGP Board at the time of the Transaction, having served continuously in that capacity since January 2011.[42] Upon closing, Mathrani became a top executive at Brookfield.[43]  The Merger Agreement identifies Mathrani as a GGP director "affiliated" with Brookfield, along with the Brookfield Directors.[44]

Non-party, GGP, was acquired by Brookfield in 2018.  It was organized under the laws of Delaware and headquartered in Chicago, Illinois.[45]  Article VIII of

---

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] Compl. ¶ 35.

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] Compl. ¶ 39.

GGP's Certificate of Incorporation exculpates GGP's directors from liability for breaches of the duty of care.[46]

Non-party, Brookfield Asset Management ("BAM"), a Canadian corporation based in Toronto, owns a controlling stake in BPY (and other entities) and acts as its general partner.[47]

## B. GGP Emerges From Bankruptcy

In 2009, GGP, a tax-advantaged real estate investment trust ("REIT"), filed for bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").[48] GGP's reorganization plan called for a sale of the company and Brookfield emerged as the successful friendly bidder.[49]

At the time of its acquisition of GGP, Brookfield entered into two agreements that are relevant here. The first, a standstill agreement between GGP and Brookfield (the "Standstill Agreement"), provided that Brookfield was entitled to vote its shares, up to 10% of the outstanding shares of GGP, for or against any nominee to the GGP Board not designated by Brookfield.[50] The Standstill Agreement also

---

[46] *See* Miller Decl. Ex. 14 (GGP Certificate of Incorporation).

[47] Compl. ¶ 40.

[48] Compl. ¶¶ 40, 89, 91–97.

[49] *Id.*

[50] Compl. ¶ 100; Miller Decl. Ex. 10 ("Standstill Agreement") § 1.1(c).

required that any transaction between Brookfield (including BPY) and GGP be approved by a majority of GGP's stockholders not affiliated with Brookfield.[51] It stipulated further that GGP would not agree to waive for other large stockholders certain of the Standstill Agreement's provisions, including its majority-of-the-minority condition, unless it also granted a similar waiver to Brookfield.[52] The second agreement, an investment agreement (the "Investment Agreement"), provided Brookfield a right to designate three nominees for election to the GGP Board so long as it owned at least 20% of GGP's stock.[53]

Exercising its right under the Investment Agreement, Brookfield designated Clark, Flatt and Cyrus Madon (eventually replaced by Kingston) to serve as directors on GGP's Board.[54] Brookfield also successfully moved in the Bankruptcy Court to have Haley and Fiala appointed to the Board.[55] Once the acquisition out of bankruptcy was finalized, Brookfield "recruited" Mathrani to become GGP's CEO and he soon after joined the Board as well.[56] As noted, these directors remained on

---

[51] Compl. ¶ 100; Standstill Agreement § 1.1(e).

[52] Standstill Agreement § 1.1.

[53] Miller Decl. Ex. 2 ("Inv. Agreement") § 5.10(a).

[54] Compl. ¶ 97.

[55] Compl. ¶¶ 31, 99–100.

[56] Compl. ¶ 115(a).

the GGP Board until the Transaction closed. A seventh, Fukakusa, was later recruited to the Board by Brookfield and also remained until the Transaction.[57]

In each of its Form 10-Ks filed from 2011 through 2018, GGP disclosed: "Brookfield owns, or manages on behalf of third parties, a significant portion of the shares of our common stock," and reported that this "concentration of ownership . . . may make some transactions more difficult or impossible without their support, or more likely with their support."[58] Each Form 10-K also disclosed that Brookfield had "significant influence over" GGP concerning, among other matters, "any determinations with respect to mergers or other business combinations."[59]

## C. GGP Explores Strategic Alternatives

On January 17, 2016, Mathrani informally shared with the Brookfield Directors his opinion that public stock markets undervalued GGP's assets relative to private real estate markets.[60] He then discussed his valuation concerns with the full Board and reiterated them publicly during an investor conference call where he opined that deteriorating market conditions had created "a wide discount between

---

[57] Compl. ¶ 132.

[58] Compl. ¶¶ 109–12.

[59] *Id.*

[60] Compl. ¶ 75.

public and private markets."[61] This, in turn, prompted GGP's Board to consider all strategic alternatives.[62] Mathrani explained:

> [T]here's no sacred cow. We will look at all alternatives . . . . It will be naïve for us not to look at all options available to us to create shareholder value. . . . So we're—we will evaluate one of all multiple paths to go on, and we will make some decisions in the near term.[63]

Mathrani's comments came amidst deteriorating market conditions for the brick-and-mortar retail industry.[64] Indeed, GGP management informed the Board in February 2017 that they had revised downward GGP's 2017 management projections due to negative market conditions in the retail property industry.[65] Four months later, in June 2017, management informed the Board that they had again

---

[61] Compl. ¶¶ 69–77, 80, 119, 154, 158, 174, 197.

[62] Compl. ¶ 71.

[63] Miller Decl. Ex. 20 ("2017 Investor Call Tr.") at 10. When asked "[f]rom the plate of options that you have, buying back stocks, spinoff or asset sales or selling the company, is there one or a couple that is part at least attractive," Mathrani responded "[t]here is no sacred cow." *Id.* at 8. Plaintiffs argue the transcript of the 2017 Investor Call cannot be considered because it is beyond the four corners of the Complaint. (Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss) (D.I. 126) ("Pls.' Answering Br.") at 21. But Plaintiffs referenced the transcript in their Complaint, excerpting selective quotes from Mathrani's statements. *See* Compl. ¶¶ 71–74. Under the incorporation by reference doctrine, the Court may "review the actual document to ensure that the plaintiff has not misrepresented its contents and that any inference the plaintiff seeks to have drawn is a reasonable one." *Yahoo!*, 132 A.3d at 797. The doctrine is intended to "limit[] the ability of the plaintiff to take language out of context because the defendants can point to the entire document," *i.e.*, this precise situation. *Id.*

[64] Proxy at 57–59.

[65] *Id.* at 57.

16

made downward revisions to GGP's 2017 projections of its "financial performance."[66]

To gauge the potential market valuation of GGP's portfolio of assets in the midst of increasing headwinds, the Board authorized the marketing of two of the Company's properties.[67] After receiving proposals well below the hoped-for valuation on one of the properties, GGP became concerned that its implied valuation and capitalization rate could put pressure on the net asset value of GGP's overall portfolio.[68] On the outside, at least, GGP's concerns went unnoticed: on November 2, 2017, BPY CFO Davis was asked by an analyst whether his estimated net value of GGP's assets changed from his estimate in an earlier quarter. After the analyst stated, "I think it was about $29 a share in Q2," Davis replied "[i]t's about $30 per share[, because] [w]hat [BPY] saw this quarter is just continued pickup of our share of [GGP's] earnings."[69]

---

[66] Compl. ¶ 272.

[67] Proxy at 58–59.

[68] *Id.* at 59, 65–67.

[69] Compl. ¶ 79.

17

**D. The Brookfield Offer and Formation of the Special Committee**

By letter dated November 11, 2017 (the "Offer Letter"), Brookfield extended an unsolicited offer to acquire the remainder of GGP's shares (the "2017 Offer").[70] The Offer Letter requested that GGP appoint a committee of independent directors to "evaluate" the 2017 Offer and clarified that the acquisition proposal would "be subject to customary approvals including, as is required by the [S]tandstill [A]greement, approval of a majority of the Company's stockholders not affiliated with BPY."[71]

The Board met telephonically the next day to discuss the 2017 Offer. The three Brookfield designated directors, Clark, Flatt and Kingston, recused. At that meeting, the Board formed the Special Committee consisting of Fiala, Fukakusa, Haley, Hurwitz and Lofgren, and empowered it with a broad mandate, including the authority to engage advisors, direct negotiations with Brookfield and engage with others who might be interested in pursuing a transaction.[72] On this latter point, the Special Committee was empowered to negotiate with topping bidders but could not approve a deal with a third-party topping bidder and recommend it to stockholders

---

[70] Compl. ¶¶ 135, 138. On behalf of Brookfield, Kingston had approached Hurwitz on November 10 to inform him that an offer was coming. Compl. ¶ 136. Hurwitz was later selected as head of the Special Committee. *Id.*

[71] Compl. ¶ 138; Offer Letter at 2.

[72] Compl. ¶¶ 138, 144–45, 151, 164; Proxy at 60–61.

without coming back to the Board.[73]  The Board resolution establishing the Special Committee also empowered it to "determine to elect not to pursue [Brookfield's] Proposal" or any alternative transaction.[74]

The Special Committee held its first meeting the same day it was formed, November 12, 2017, retaining Simpson Thacher & Bartlett as legal counsel and Goldman Sachs & Co. LLP as financial advisor.[75]  Goldman's $30 million fee was made contingent on completing a deal.[76]

On November 13, 2017, GGP and Brookfield publicly disclosed the Offer Letter.[77]  Brookfield's press release reiterated that any transaction was subject to "customary approvals, including[] approval of a majority of the Company's stockholders not affiliated with [Brookfield]."[78]  The press release confirmed GGP's

---

[73] Compl. ¶ 151.

[74] *Id.*

[75] Compl. ¶ 144.  There was no "beauty contest" for the financial advisor role, and the minutes do not mention discussion of any other financial advisor.  *Id.*

[76] Compl. ¶¶ 159–63, 169, 271.

[77] Proxy at 6; *see also* Miller Decl. Ex. 5 (Nov. 13, 2017 GGP Press Release) ("GGP Press Release"), Ex. 6 (Nov. 13, 2017 Brookfield Press Release) ("Brookfield Press Release").

[78] Brookfield Press Release.

receipt of the Offer Letter, the formation of the Special Committee and the Special Committee's selection of advisors.[79]

## E. The Special Committee Negotiates with Brookfield

From November 15, 2017 to March 26, 2018 (the date on which the Merger Agreement was executed), the Special Committee held over thirty meetings to consider Brookfield's proposal and its strategic options.[80]  Plaintiffs do not allege that the Brookfield Directors participated in this process in any manner at any time.

In December of 2017, the Special Committee rejected the 2017 Offer, expressing to Brookfield it would consider an offer with improved financial terms, including a shift in the form of consideration.[81]  Goldman Sachs also repeatedly encouraged Brookfield to incorporate a larger cash component in any revised proposal.[82]

Brookfield finally acceded to Goldman and the Special Committee's request on February 23, 2018, when it delivered a revised proposal to acquire all of the GGP stock it did not already own for either 0.9656 BPY units per share, or an equivalent amount of newly issued stock in Brookfield Property REIT Inc. ("BPR")—a new

---

[79] GGP Press Release.

[80] Proxy at 61–78, 87.

[81] Compl. ¶ 156; Proxy at 63–64.

[82] Proxy at 68.

U.S. REIT security designed to mirror the economics of a BPY unit, or $23 in cash per share, subject to a 60% cash and 40% equity proration (as opposed to the 50% cash and 50% equity proration in Brookfield's 2017 Offer).[83] On February 24, 2018, the Special Committee met with its advisors to consider Brookfield's revised proposal.[84] After reviewing Goldman's preliminary financial analysis of both the revised offer and GGP on a standalone basis, the Special Committee discussed (1) the market conditions then impacting the retail property industry and its impact on REITs, and (2) that no party other than Brookfield had approached GGP concerning a potential transaction since May 1, 2017, when GGP announced it was considering strategic alternatives.[85] The Special Committee determined that it would respond to Brookfield with a counteroffer of $24 per share, consisting of 70% cash and 30% BPY units or BPR stock.[86]

Brookfield rejected the Special Committee's counteroffer later that same day.[87] After the Special Committee met with its advisors on February 25, 2018, it asked Brookfield to present its "best and final" proposal; Brookfield responded

---

[83] *Id.* at 66, 68.

[84] *Id.* at 68.

[85] *Id.* at 69.

[86] *Id.*

[87] *Id.* at 70.

with a revised proposal consisting of $23.50 per share in cash (capped at $9.25 billion) or one BPY unit (or one share of BPR stock) per share of GGP stock, subject to a 61% cash and 39% equity proration (the "Final Offer").[88] Brookfield also stated that if the Special Committee did not find the terms of this proposal acceptable, the parties should terminate discussions.[89]

On February 25, 2018, the Special Committee met with its advisors to consider the Final Offer.[90] Goldman informed the Special Committee that the Final Offer increased aggregate cash consideration over Brookfield's initial 2017 Offer by $1.9 billion but decreased the overall consideration.[91] The Special Committee resolved to begin negotiating the Merger Agreement based on Brookfield's Final Offer.[92]

## F. The Merger Agreement

Between February 25 and the end of March 2018, the Special Committee met with its advisors at least twelve times to discuss the terms of what would become the

---

[88] Compl. ¶ 2; Proxy at 70.

[89] Proxy at 70.

[90] *Id.*

[91] *Id.* at 70–71.

[92] *Id.* at 71.

Merger Agreement and to undertake "due diligence with respect to BPY."[93] Although GGP was not subject to an exclusivity agreement with Brookfield, and was free to consider other proposals, no other bidders emerged in the interim.[94] On March 26, 2018, nearly five months after the 2017 Offer, the Special Committee unanimously recommended that the Board approve the Final Offer and execute a definitive Merger Agreement.[95] Immediately following the Special Committee meeting, the Board's Audit Committee (consisting of Fukakusa, Haley and Hurwitz—each of whom were Special Committee members) met to consider the proposed Transaction in accordance with GGP's Related Party Transaction Policy, which prohibited any transaction between Brookfield and GGP unless the Audit Committee "determines the transaction is on terms comparable to those that could be obtained in arm's length dealings with an unrelated third party."[96] After approximately five minutes, the Audit Committee unanimously determined that the proposed Transaction was on terms comparable to those that could be obtained from

---

[93] *Id.* at 71–79.

[94] *Id.* Goldman spoke with "management representatives of certain of GGP's competitors in the real property industry" during this time, but "none . . . expressed any interest or ability to pursue an acquisition of GGP." *Id.* at 71.

[95] *Id.* at 79.

[96] Compl. ¶ 191.

an unrelated third party and, like the Special Committee, unanimously recommended that the Board approve the proposed Transaction.[97]

The Board (with the three Brookfield-affiliated GGP directors recusing) then met to consider the proposed Transaction.[98] After further discussion, the Board unanimously agreed with the Special Committee that the Transaction was fair to and in the best interests of GGP and its stockholders unaffiliated with Brookfield.[99]

That same day, March 26, 2018, GGP and Brookfield executed the Merger Agreement and related documents and issued a press release announcing the Transaction.[100] The Transaction was conditioned on the approval of a majority of the GGP stock unaffiliated with Brookfield.[101] Upon such approval, GGP would declare a pre-closing dividend payable in respect of all shares of GGP stock unaffiliated with Brookfield in which stockholders could elect to receive, subject to proration and other adjustments, cash or BPY units (or BPR stock), with the

---

[97] Compl. ¶¶ 133, 192–93; Proxy at 79. It is important to note that Plaintiffs do not allege that Mathrani participated in any way in, much less interfered with, the Special Committee's process as it negotiated and then consummated the Transaction.

[98] Proxy at 79–80.

[99] *Id.*

[100] Compl. ¶ 165; Proxy at 80.

[101] Compl. ¶ 206(h).

24

understanding that all stockholders would receive the balance of the cash merger consideration at closing.[102]

No competing offers emerged between public announcement of the Transaction and closing. According to Plaintiffs, this is likely due to the Merger Agreement's deal protection devices, which included a $400 million breakup fee,[103] a no-solicitation term,[104] a matching-rights provision,[105] and four-business-days' notice to Brookfield of GGP's intent to discuss a potential superior offer, as well as two business days to match any competing offer.[106]

On June 27, 2018, GGP filed jointly with Brookfield its definitive Proxy soliciting a "yes" vote on the Transaction from GGP's stockholders unaffiliated with Brookfield in both a Form S-4 (GGP solicitation) and Form F-4 (BPY foreign-issuer registration).[107] Relevant here, the Proxy disclosed:

- The deal's structure, consisting of (1) the Pre-Closing Dividend and (2) the balance of the deal consideration, the latter of which was defined in the Proxy as the "merger consideration" in lowercase;[108]

---

[102] *Id.*

[103] Compl. ¶ 188.

[104] Compl. ¶ 182.

[105] Compl. ¶¶ 183–85.

[106] Compl. ¶ 183.

[107] Compl. ¶ 3.

[108] Compl. ¶ 4.

25

- GGP stockholders' right to "demand appraisal of their shares of GGP common stock (i.e., the dissenting shares) and receive in lieu of the per share merger consideration a cash payment equal to the 'fair value' of their GGP common stock, as determined by the Delaware Court of Chancery . . . ";[109]
- That the Audit Committee determined the proposed Transaction was on terms comparable to those that could be obtained in arm's length dealings with an unrelated third party;[110]
- That the impact of the Tax Cuts and Jobs Act ("TCJA") on individual GGP stockholders' post-Transaction holdings was uncertain;[111]
- Mathrani's entitlement to a severance payment contemplated under his 2015 GGP employment agreement and his new employment agreement with Brookfield, to go into effect upon completion of the Transaction, with terms comparable to his GGP employment agreement;[112]
- Fukakusa's work history with RBC and RBC's role in the Transaction;[113] and
- That Goldman had approached several of GGP's competitors, none of whom were interested in pursuing a combination with GGP.[114]

The Proxy did not disclose:

- The length of the Audit Committee meeting;
- The potential downward pressure a controller's presence may have on the price of a company's publicly traded stock;
- Mathrani's alleged enthusiasm for a sell-off-the-parts strategy and Davis' estimation of GGP's NAV, as stated on investor calls; or

---

[109] Proxy at 32.

[110] *Id.* at 79.

[111] *Id.* at 9, 196–97.

[112] *Id.* at 140–43.

[113] *Id.* at 130, 247. Specifically, and as discussed below, the Proxy disclosed that RBC, along with several other financial institutions, would act as joint lead arrangers and joint book runners in connection with the Transaction. *Id.*

[114] *Id.* at 57, 71.

- The extent of Fukakusa's stockholdings in RBC, her relationships with Brookfield or her son's employment as vice president at RBC throughout the deal process.

On July 26, 2018, holders of approximately 94% of voting shares unaffiliated with Brookfield approved the Transaction.[115] Brookfield and GGP jointly disseminated an Election Form the next day.[116] The Election Form instructed holders to elect among three choices: cash-electing shares, stock-electing shares and non-electing shares. The form stated that each cash-electing GGP share will receive $14.642 in cash and 0.376 units of BPY or shares of BPR Class A stock; each stock-electing GGP share will receive 0.986 units of BPY or shares of BPR Class A stock and $0.312 in cash; and each non-electing GGP share will receive $14.642 in cash and 0.376 units of BPY.[117]

On August 24, 2018, the last full trading day before closing, BPY units closed on the NASDAQ at $19.66; thus, as of that date, a cash-electing or non-electing share received the blended value of $22.034 per share, and a stock-electing share

---

[115] Compl. ¶ 229; Miller Decl. Ex. 9 (July 26, 2018 GGP Form 8-K) ("Form 8-K") at Item 5.07.

[116] Decl. of Samuel L. Closic in Connection with Pls.' Answering Br. in Opp'n to Defs.' Mots. to Dismiss (D.I. 126–28) Ex. C ("Election Form").

[117] *Id.*

received the value equivalent of $19.385 per share.[118]  The Transaction closed on August 28, 2018.[119]

## G. Mathrani's Compensation and Transaction-Related Benefits

Brookfield's chosen CEO for GGP, Mathrani, was paid handsomely as a result of the Transaction.  He recovered his unvested stock options in GGP worth $42.1 million, received an additional $145 million in instant liquidity when Brookfield acquired his shares and vested options, and was paid $7.1 million in cash severance benefits.[120]  He also negotiated an agreement with Brookfield for post-Transaction employment with substantial benefits and compensation.[121]  Those negotiations are alleged to have begun "days" before the Merger Agreement was signed.[122]

## H. RBC's Role in the Transaction

RBC was one-fourth of the four-bank syndicate providing $12.75 billion in new loans to finance the Transaction, with its share of the financing exceeding

[118] Compl. ¶ 281.

[119] Compl. ¶ 1.

[120] Compl. ¶ 115.

[121] *Id.*

[122] Compl. ¶ 7.

$3.2 billion.[123] Its relationship with GGP extends back at least to 2013, when it entered into and at various times amended a credit agreement with GGP amounting to $1.5 billion.[124]

The Merger Agreement required that, upon closing, GGP or Brookfield would repay RBC in full with "cash on hand or proceeds from the Financing or the Requested Transactions (or other funds provided by [Brookfield]" and discharge all obligations under the 2015 credit agreement totaling $1.5 billion.[125] RBC was also Brookfield's second-largest stockholder, with approximately $3.12 billion in BAM stock and $682 million in BPY units.[126]

## I.  Procedural History

Following the announcement of the Merger Agreement, two putative class actions were filed and subsequently consolidated.[127] Plaintiffs thereafter moved to expedite and for a preliminary injunction based principally on alleged disclosure

---

[123] Compl. ¶¶ 122–23.

[124] Compl. ¶ 124.

[125] Merger Agreement § 6.17; Compl. ¶¶ 14, 41.

[126] Compl. ¶ 41.

[127] *See Susman v. Clark*, C.A. No. 2018-0267-JRS (filed April 10, 2018); *Lowinger v. Mathrani*, C.A. No. 2018-0272-JRS (filed April 11, 2018); *In re GGP Inc. S'holder Litig. See* C.A. No. 2018-0267-JRS (D.I. 7) (consolidating the actions).

violations.[128]  After GGP responded to Plaintiffs' concerns by filing its June 11, 2018 Amendment No. 1 to the preliminary proxy, Plaintiffs withdrew their motions.[129]

After the definitive Proxy was issued and the Transaction consummated, Plaintiffs filed a Consolidated Verified Second Amended Shareholder Class Action Complaint on January 7, 2019.[130]  On April 6, 2019, before Plaintiffs responded to Defendants' opening briefs in support of their motions to dismiss, the Court granted Plaintiff Kosinski's motion to intervene in this action for the limited purpose of staying this action while he pursued GGP books and records under 8 *Del. C.* § 220.[131]

On August 28, 2019, then-Vice Chancellor McCormick ruled that Kosinski had "demonstrated proper purposes" for the inspection of GGP's books and records and directed the parties to meet and confer regarding the scope of the inspection.[132] GGP produced documents including Board and Special Committee meeting minutes and materials, director questionnaires, as well as emails.

---

[128] *Susman*, C.A. No. 2018-0267-JRS, D.I. 20–22.

[129] *Id.* at D.I. 50.

[130] D.I. 61.

[131] *Kosinski v. GGP, Inc.*, C.A. No. 2018-0540-KSJM (Del. Ch.).

[132] 220 Decision at 957.

On February 10, 2020, the Court entered final judgment in the 220 Action. After motion practice and responsive amendments under Chancery Rule 15(aaa), Plaintiffs filed the operative Complaint on May 4, 2020, stating six causes of action.[133] Count I alleges breach of fiduciary duty against BPY in its capacity as controlling stockholder of GGP.[134] Count II alleges breach of the fiduciary duty of loyalty against the Director Defendants for approving the Transaction.[135] Count III alleges breach of the fiduciary duty of loyalty against all Defendants for failing to provide GGP stockholders with a fair summary of their appraisal rights and disclosing all material information relevant to GGP stockholders when deciding whether to vote in favor of the Transaction or pursue appraisal.[136] Count IV alleges breach of fiduciary duty against Mathrani, BPY and the Brookfield Defendants for each party's role in the negotiation of Mathrani's post-Transaction employment contract, thereby facilitating Brookfield's control over Mathrani and allowing him to be objectively compromised as he participated in negotiating the Transaction.[137]

---

[133] D.I. 109.

[134] Compl. ¶¶ 291–94.

[135] Compl. ¶¶ 295–301. As noted, GGP's certificate of incorporation contains a provision exculpating GGP directors from monetary liability for claims alleging breach of the fiduciary duty of care. Compl. ¶ 306.

[136] Compl. ¶¶ 302–07.

[137] Compl. ¶¶ 308–17.

Count V alleges unjust enrichment against Brookfield as the party on the other side of an allegedly unfair Transaction.[138] Finally, Count VI alleges aiding and abetting breaches of fiduciary duties in the alternative against BPY if it is deemed not to be GGP's controlling stockholder.[139]

Four groups of Defendants filed separate opening briefs in support of motions to dismiss the Complaint on July 6, 2020.[140] Plaintiffs filed their consolidated answering brief on September 4, 2020,[141] to which Defendants replied on October 19, 2020.[142] Oral argument was held on November 16, 2020.[143] After a

---

[138] Compl. ¶¶ 318–25.

[139] Compl. ¶¶ 326–30.

[140] D.I. 113 (Special Committee Defs.' Opening Br. in Supp. of Mot. to Dismiss) ("Special Committee Defs.' Opening Br."); D.I. 114 (Mathrani Def.'s Opening Br. in Supp. of Mot. to Dismiss) ("Mathrani Def.'s Opening Br."); D.I. 118 (Brookfield); D.I. 119 (Clark, Flatt and Kingston Defs.' Opening Br. in Supp. of Mot. to Dismiss) ("Brookfield Director Defs.' Opening Br.").

[141] D.I. 126.

[142] D.I. 131 (Clark, Flatt and Kingston Defs.' Reply Br. in Further Supp. of Mot. to Dismiss) ("Brookfield Director Defs.' Reply Br."); D.I. 133 (Mathrani Def.'s Reply Br. in Further Supp. of Mot. to Dismiss) ("Mathrani Def.'s Reply Br."); D.I. 134 (Brookfield Defs.' Reply Br. in Further Supp. of Mot. to Dismiss) ("Brookfield Defs.' Reply Br."); D.I. 135 (Special Committee Defs.' Reply Br. in Further Supp. of Mot. to Dismiss) ("Special Committee Defs.' Reply Br.").

[143] D.I. 142.

request for supplemental briefing on December 31, 2020,[144] the matter was deemed submitted for decision on February 18, 2021.[145]

## II. ANALYSIS

Chancery Rule 12(b)(6) requires dismissal of a complaint if the plaintiff could not recover under "any reasonably conceivable set of circumstances susceptible of proof" based on the complaint's well-pled facts.[146] While the court need not accept conclusory allegations or "every strained interpretation of the allegations proposed by plaintiff,"[147] it "must accept as true all well-pled allegations in the complaint and draw all reasonable inferences from those facts in plaintiff's favor."[148]

### A. Brookfield is Not a Controller

"Under *Corwin*, the business judgment rule applies to transactions where no controlling shareholder is involved and a majority of the Company's disinterested shareholders approves the transaction with a fully informed, uncoerced vote."[149] "The rationale of this line of cases is simple—where holders of a majority of stock

---

[144] D.I. 143.

[145] D.I. 146–47.

[146] *See Gen. Motors*, 897 A.2d at 168; *see also Savor Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[147] *Id.*

[148] *Rouse*, 2018 WL 1226015, at *10 (citations omitted).

[149] *Id.* at *11 (internal quotations omitted).

33

vote to evince their determination that the transaction is in the corporate best interest, there is little utility in a judicial second-guessing of that determination by the owners of the entity."[150]

Where a conflicted controller stands on both sides of a transaction, however, its fingerprints on the deal cannot be so readily cleansed—"*Corwin* cannot protect a board's determination to recommend a transaction when it is reasonably conceivable that a conflicted controller may have influenced the board and the stockholder decisions to approve the transaction."[151]  The rationale is, again, straightforward: "controller transactions are inherently coercive . . . [and] cannot [therefore] be ratified by a vote of the unaffiliated majority."[152]  "[T]he concern is that fear of controller retribution in the face of a thwarted transaction may overbear a

---

[150] *Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at *15 (Del. Ch. May 31, 2017).

[151] *Rouse*, 2018 WL 1226015, at *11.

[152] *Sciabacucchi*, 2017 WL 2352152, at *15; *see also* Leo E. Strine, Jr., *The Delaware Way: How We Do Corporate Law and Some of the New Challenges We (And Europe) Face*, 30 DEL. J. CORP. L., 673, 678 (2005) ("Consistent with the nuance that infuses our common law, Delaware is more suspicious when the fiduciary who is interested is a controlling stockholder.  When that is so, there is an obvious fear that even putatively independent directors may owe or feel a more-than-wholesome allegiance to the interests of the controller, rather than to the corporation and its public stockholders.  For that reason, when a controlling stockholder is on the other side of the deal from the corporation, our law has required that the transaction be reviewed for substantive fairness even if the transaction was negotiated by independent directors or approved by the minority stockholders.").

determination of best corporate interest by the unaffiliated majority. In such a case, the Court cannot determine that a vote ratifies the transaction on its own merits."[153]

But fiduciaries transacting with a conflicted controller are not without means to attain coveted business judgment rule deference.[154] In *In re MFW Shareholders Litigation*, then-Chancellor Strine laid out a process, later endorsed by our Supreme Court, by which fiduciaries and controlling stockholders negotiating "going private mergers" can obtain business judgment deference if, from the outset, the transaction is negotiated and approved by disinterested and independent directors and conditioned on the informed and uncoerced vote of a majority of the minority stockholders.[155]

Plaintiffs allege Brookfield was a conflicted controller; Defendants disagree. Because Brookfield's status as a conflicted controller, or not, bears directly on the analytical framework within which the Court must review Plaintiffs' breach of fiduciary duty and related claims, it is appropriate to address this issue first.[156]

---

[153] *Sciabacucchi*, 2017 WL 2352152, at *15.

[154] *See* Peter V. Letsou, Steven M. Haas, *The Dilemma That Never Should Have Been: Minority Freeze Outs in Delaware*, 61 BUS. LAWYER 25, 82 (Nov. 2005) (discussing the "covetable policy ramifications" of a "judicial procedure that permits invocation of the business judgment rule when a freeze out is independently approved [by non-affiliated stockholders and meets other criteria]").

[155] 67 A.3d 496 (Del. Ch. 2013).

[156] *See Larkin v. Shah*, 2016 WL 4485447, at *7 (Del. Ch. Aug. 25, 2016).

Under Delaware law, a stockholder will be deemed a controlling stockholder where he "(1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but exercises control over the business affairs of the corporation."[157] It is undisputed that Brookfield held 35.3% of GGP's common stock at the time of the Transaction. Plaintiffs, therefore, must tread the path of well pleading that, notwithstanding Brookfield's minority stockholder status, it actually "controlled the business affairs" of GGP. While this implicates "an intensely factual" inquiry that is often "difficult [] to resolve on the pleadings,"[158] a plaintiff cannot simply allege that a minority blockholder is a controller, tout its substantial holdings and commensurate influence, leave it at that and then hope to survive a motion to dismiss. More is needed.[159]

---

[157] *KKR*, 101 A.3d at 991.

[158] *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 550–51 (Del. Ch. 2003).

[159] *See Rouse*, 2018 WL 1226015, at *11 ("Given that the 'controlling stockholder' designation for a minority blockholder imposes upon that stockholder fiduciary duties where none otherwise would exist, our courts generally recognize that demonstrating the kind of control required to elevate a minority blockholder to controller status is 'not easy.'" (quoting *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006))); *see also Sciabacucchi*, 2017 WL 2352152, at *16 ("This actual control test is not an easy one to satisfy as stockholders with very potent clout have been deemed, in thoughtful decisions, to fall short of the mark." (internal quotations omitted)). *See also van der Fluit v. Yates*, 2017 WL 5953514, at *7 (Del. Ch. Nov. 30, 2017) (dismissing claim that minority blockholder was a controlling stockholder); *Larkin*, 2016 WL 4485447, at *1 (same); *KKR*, 101 A.3d at 983 (same).

36

For Brookfield to be deemed a controller notwithstanding its minority equity interest, it must "exercise[] such formidable voting and managerial power that, as a practical matter, it is no differently situated than if it had majority voting control."[160] Stated differently, its "power must be so potent that independent directors cannot freely exercise their judgment, fearing retribution from the controlling minority blockholder."[161] With these considerations in mind, the minority blockholder will be deemed a controlling stockholder **either** if he "actually dominated and controlled the corporation, its board or the deciding committee with respect to the challenged transaction,"[162] such that his "presence is hard to ignore because he has injected himself as 'dominator' into the board's process while it considers the transaction and is, in that sense, actually 'in the board room,'"[163] **or** he "actually dominated and controlled the majority of the board generally."[164] In this latter scenario, the controller's dominating presence is evidenced "by the board's awareness of his

---

[160] *In re Morton's Rest. Gp. S'holders Litig.*, 74 A.3d 656, 665 (Del. Ch. 2013).

[161] *Id.* (internal quotation omitted).

[162] *Rouse*, 2018 WL 1226015, at *12 (citing *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006)).

[163] *Id.*

[164] *Id.* (citing *Sciabacucchi*, 2017 WL 2352152, at *17; *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1114–15 (Del. 1994); *Cysive*, 836 A.2d at 531).

37

ability to make changes at the board level or to push other coercive levers should he be displeased with the board's performance or decision-making."[165]

Plaintiffs argue they have well pled that Brookfield controlled the Board both with respect to the Transaction and GGP's business affairs more generally. I address each argument in turn.

### 1. Brookfield Did Not Control the Special Committee's Negotiation of the Transaction

Plaintiffs allege that "of nine GGP directors, at least five (and conceivably all) were not independent, not disinterested, or both."[166] Because a majority of GGP's directors were conceivably subject to Brookfield's influence, Plaintiffs contend it is reasonably conceivable that Brookfield actually dominated and controlled GGP's Board with respect to the Transaction.

Of course, Delaware law presumes "that a director's decision is based on the corporate merits of the subject matter before the board rather than extraneous considerations or influence."[167] "In order to overcome that presumption in the controller context, the plaintiff must plead facts that support a reasonable inference

---

[165] *Id.*

[166] Pls.' Answering Br. at 53.

[167] *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *11 (Del. Ch. May 22, 2000).

the director is either beholden to the shareholder or so under its influence that his discretion is sterilized."[168]

Plaintiffs do not dispute Brookfield moved to neutralize its influence (such as it was) over the Board's consideration of the Transaction by recognizing *ab initio* that any transaction with GGP would be "subject to customary approvals including, as is required by the [S]tandstill [A]greement, approval of a majority of the Company's stockholders not affiliated with Brookfield."[169] Plaintiffs also acknowledge in the Complaint that GGP formed a five-member Special Committee, at Brookfield's request, to neutralize the influence of the Brookfield Directors and Mathrani.[170] This five-member Special Committee constituted a Board quorum

---

[168] *Rouse*, 2018 WL 1226015, at *13.

[169] Offer Letter at 2. While Plaintiffs argue some of the Standstill Agreement's conditions were "waivable" if GGP waived such requirements for another competing bidder, no bidder ultimately emerged and there are no facts pled to suggest the Special Committee ever contemplated waiving these requirements or that they were, in any event, considered discretionary by the Special Committee. *See* Pls.' Answering Br. at 72 n.237 ("The Company shall not waive any provisions similar to Sections 1.1(c), (e) or (f) above for any Large Stockholder [*i.e.*, a holder of more than 10% of GGP's equity] under any other agreement unless the Company [GGP] grants a similar waiver under this Agreement." (quoting Standstill Agreement § 1.1)).

[170] Offer Letter at 2; Compl. ¶ 145; Proxy at 61–62, 79, 121. Plaintiffs cite *Rouse* for the proposition that a CEO who negotiates for post-merger employment and merger-related compensation while negotiating the merger itself labors under an irreconcilable conflict. But, unlike *Rouse*, where the CEO was on the special committee, and participated in negotiations, Mathrani was not on GGP's special committee and did not participate in negotiations. *See Rouse*, 2018 WL 1226015, at *13–14; *see also* Compl. ¶¶ 37–38 (describing Mathrani's conflicts).

39

under GGP's bylaws, meaning these directors could unilaterally convene a Board meeting and approve any action, including an alternative transaction, without the support of (or over opposition from) the Brookfield Directors or Mathrani.[171]

The Brookfield Directors, for their part, are not alleged to have participated in the Special Committee's decision-making process.[172] Mathrani is not alleged to have participated in negotiating the Transaction either, only casting his vote to approve the Transaction after receiving the Special Committee's unanimous recommendation following its months-long review.[173] Under Section 141(e) of the

---

[171] *See* Miller Decl. Ex. 11 (GGP Bylaws) at Art. II, §§ 3, 6 (filed as Ex. 3.1 to June 2, 2017 GGP Inc. Form 8-K).

[172] Plaintiffs' attempt to problematize the Brookfield Directors' *in*action fails. *See* Pls.' Answering Br. at 164 (arguing the Brookfield Directors breached their fiduciary duties by "conceal[ing] Davis' valuation, compromis[ing] Mathrani, [and] conceal[ing] Fukakusa's conflicts . . . ." (citing Compl. ¶¶ 78, 118, 133, 237, 261–63, 316)). The information allegedly "concealed" by the Brookfield Directors is, as explained *infra*, not material. Mathrani's post-Transaction compensation is also irrelevant, as that arrangement was known to the Board and Mathrani is not alleged to have participated in negotiations. *See* Proxy at 141–44 (disclosing Mathrani's Transaction-related compensation and employment arrangements); *see also In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1006 (Del. Ch. 2005) (explaining that the court's job "is not to police the appearances of conflict that, upon close scrutiny, do not have a causal influence on a board's process."). Brookfield cannot be said to have exerted influence on a Transaction through directors who recused themselves from the start of negotiations. *See In re Crimson Expl. S'holder Litig.*, 2014 WL 5449419, at *11 n.66 (Del. Ch. Oct. 24, 2014) ("[T]he focus of the inquiry has been on the de facto power of a significant (but less than majority) shareholder, which, when coupled with other factors, gives that shareholder the ability to dominate the *corporate decision-making process*." (quoting *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006) (emphasis added))).

[173] Plaintiffs argue Mathrani was involved in the Transaction because "(i) he voted for it at the board level; (ii) he signed the Proxy's covering letter as CEO, urging a 'yes' vote on

Delaware General Corporation Law, directors are entitled to rely in good faith on a special committee's recommendation absent credible allegations of flaws in that committee's process.[174]

Plaintiffs' argument that Brookfield controlled GGP's process leading to the Transaction thus turns on whether they have well pled that the Special Committee was beholden to Brookfield such that Brookfield "actually dominated and controlled

---

the Buyout; (iii) he signed the Merger Agreement; (iv) he surveilled the Five-Minute [Audit Committee] Meeting; and (v) he declined to require Proxy disclosure of his oft-expressed value-maximizing strategy and the reasons he departed from it to support the [Transaction]." Pls.' Answering Br. at 55 (citing Proxy at 79; Compl. ¶¶ 72–76, 239–40, 313)). By Plaintiffs' own admission, then, Mathrani is not alleged to have "set the terms of the deal . . . [or] deceive[d] the board . . . [or] dominate[d] or control[led] the other directors' approval of the Transaction." *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 906 A.2d 114, 121 (Del. 2006) (dismissing fiduciary duty claims against conflicted director). And, for reasons explained *infra*, Plaintiffs mischaracterize Mathrani's publicly-known "value-maximizing" strategy. *See* Investor Tr. 8, 10 (Mathrani describing publicly possible strategies to catalyze appreciation of GGP's stock).

[174] 8 *Del. C.* § 141(e); *see also Crimson*, 2014 WL 5449419, at *25; *In re Ebix, Inc. S'holder Litig.*, 2018 WL 3545046, at *13 (Del. Ch. July 17, 2018). Plaintiffs' sole argument against application of Section 141(e) to Mathrani is that he did not rely on the Special Committee's recommendation in good faith because of his employment agreement. *See* Pls.' Answering Br. at 164. But Mathrani did not enter into an employment agreement with Brookfield until after the Merger Agreement was signed and waited to negotiate the terms of his employment until mere days before the Merger Agreement was to be executed, well after the economic negotiations had ended. Compl. ¶¶ 7, 115–16. Indeed, Brookfield submitted its final offer on February 25, 2018—a full month before the Special Committee approved the Merger and before Plaintiffs contend negotiations regarding Mathrani's employment began. Proxy at 70, 142; Compl. ¶ 7. This court has rejected similar allegations that a CEO is interested in a transaction because he negotiated post-merger employment "five days before the Merger Agreement was signed and after the economic terms and nearly all the diligence on the deal were finalized." *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *22 (Del. Ch. Mar. 31, 2017), *as revised* (Apr. 11, 2017).

41

the corporation, its board or the deciding committee with respect to the challenged transaction."[175]  One would expect, therefore, that Plaintiffs would allege facts allowing a reasonable inference that a majority of the Special Committee's members were somehow tainted by Brookfield's dominance.[176]  They do not.  Instead, Plaintiffs attack the independence and/or disinterest of two of the five Special Committee members and assert, at the threshold, that they need only plead a single Special Committee member is interested or not independent from Brookfield to make reasonably conceivable Brookfield's status as controller.[177]  Defendants counter that Plaintiffs must plead facts that support a reasonable inference the compromised minority of Special Committee members "somehow 'dominated or controlled' the Special Committee's process."[178]

---

[175] *Rouse*, 2018 WL 1226015, at *12 (citing *Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4).

[176] *See In re Pilgrim's Pride Corp. Deriv. Litig.*, 2019 WL 1224556, at *17 (Del. Ch. Mar. 15, 2019) (explaining complaint must plead "sufficient facts to implicate the Director Defendants in the negotiation, structuring or approval of the Acquisition.").

[177] Pls.' Answering Br. at 53, 78 (citing *In re AmTrust Fin. Serv. S'holder Litig.*, 2020 WL 914563, at *10 n.105 (Del. Ch. Feb. 26, 2020) (noting that whether one of the special committee member's lack of independence conceivably renders an entire committee not independent **in the context of *MFW*** [*i.e.*, when controllership has already been established] has not been decided under Delaware law).

[178] Special Committee Defs.' Opening Br. at 22 (citing *Rouse*, 2018 WL 1226015, at *15).

Defendants offer the correct interpretation of Delaware law. Where, as here, a plaintiff alleges only a minority of special committee members are incapable of disinterestedly and independently considering a transaction, a plaintiff must proffer at the pleading stage some factual predicate from which the court can infer the compromised director(s) somehow infected the special committee's process.[179] In other words, an inquiry into the existence of a minority controller focuses on whether the minority shareholder has "the ability to dominate the *corporate*

---

[179] *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 363 (Del. 1993) ("This Court has never held that one director's colorable interest in a challenged transaction is sufficient, without more, to deprive a *board* of protection of the business judgment rule presumption of loyalty. . . ." (emphasis in original)); *In re Alloy, Inc.*, 2011 WL 4863716, at *8–9 (Del. Ch. Oct. 13, 2011) (holding allegation that an allegedly conflicted corporate fiduciary "was in a position" to influence other members of a special committee was inadequate to support an inference that the special committee's process was tainted by undue influence); *Texlon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002) ("Where only one director has an interest in a transaction, however, a plaintiff seeking to rebut the presumption of the business judgment rule under the duty of loyalty must show that the interested director controls or dominates the board as a whole" (quotations omitted)); *Hamilton P'rs, L.P. v. Highland Cap. Mgmt., L.P.*, 2014 WL 1813340, at *16 (Del. Ch. May 7, 2014) (noting allegation did not support reasonable inference that controlled director sought "to comport with the wishes or interest" of controlling director and refusing to find domination on "generalized allegations"); *Rouse*, 2018 WL 1226015, at *15 ("[I]t does not necessarily follow that an interested party also *controls* directors, simply because they lack independence. Lack of independence focuses on the director, and whether she has a conflict in the exercise of her duty on behalf of her corporation. Consideration of controller status focuses on the alleged controller, and whether it effectively controls the board of directors so that it also controls disposition of the interests of the unaffiliated stockholders." (quoting *Sciabacucchi*, 2017 WL 2352152, at *17) (emphasis in original)).

43

*decision-making process*" which, in the context of this Transaction, was steered exclusively by the Special Committee.[180]

The Special Committee was comprised of Defendants, Hurwitz, Fiala, Fukakusa, Haley and Lofgren.[181] Plaintiffs did not brief and so waived any argument impeaching the impartiality of Hurwitz, Fiala and Lofgren.[182] Thus, to the extent Plaintiffs argue the Special Committee's process was poisoned by its members, their allegations are limited to Haley and Fukakusa.

Plaintiffs' allegations impugning Haley's independence from Brookfield are limited to the observations that (1) he was selected to the Board by Brookfield upon GGP's emergence from bankruptcy and (2) his tenure at Ernst & Young overlapped

---

[180] *Crimson*, 2014 WL 5449419, at *11 n.66 (quoting *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006)) (emphasis added).

[181] The Board previously determined each of these directors to be independent under NYSE listing standards. "Although the fact that directors qualify as independent under the NYSE rules does not mean that they are necessarily independent under [Delaware] law in particular circumstances, the NYSE rules governing director independence were influenced by experience in Delaware and other states and were the subject of intensive study by expert parties. They cover many of the key factors that tend to bear on independence, including whether things like consulting fees rise to a level where they compromise a director's independence, and they are a useful source for this court to consider when assessing an argument that a director lacks independence." *MFW*, 67 A.3d at 510.

[182] *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."). Plaintiffs also did not challenge these directors' independence at oral argument.

with two former Brookfield executives.[183]   But Plaintiffs do not allege Haley

interacted with or even knew the former Brookfield executives.[184]  And Haley retired

from Ernst & Young in 2009, nearly a decade before the Transaction.[185]  "Neither

mere personal friendship alone, nor mere outside business relationships alone, are

sufficient to raise a reasonable doubt regarding a director's independence."[186]  That

Haley attained his directorship by designation of Brookfield years before Brookfield

extended the 2017 Offer does not change that calculus.[187]

Plaintiffs' allegations regarding Fukakusa's supposed subjugated state fare no

better.  Plaintiffs allege Fukakusa was dominated and controlled by Brookfield

because: (1) she served as an RBC executive for 30 years (13 as CFO) before joining

---

[183] Compl. ¶ 134.  I note Plaintiffs did not advance an argument that Haley harbored any self-interest adverse to GGP's stockholders.

[184] While the 220 Decision noted Haley's employment history may be "evidence of another *possible* conflict" under the applicable credible basis burden of proof, Plaintiffs have not pled facts supporting a reasonable inference that such a conflict exists.  220 Decision at 954 (emphasis added).

[185] Proxy at 247.

[186] *Litt v. Wycoff*, 2003 WL 1794724, at *4 (Del. Ch. Mar. 28, 2003).

[187] *See Edgewater Growth Cap. P'rs LP v. H.I.G. Cap., Inc.*, 68 A.3d 197, 230 (Del. Ch. 2013) ("Our Supreme Court has long recognized that the manner in which someone is nominated to the board is not evidence of their lack of independence."); *see also KKR*, 101 A.3d at 996 ("It is well-settled Delaware law that a director's independence is not compromised simply by virtue of being nominated to a board by an interested stockholder.").

the GGP Board;[188] (2) she owned $31–41 million in RBC equity; (3) RBC stood to gain from the Transaction via (a) GGP's anticipated payoff of an existing loan from RBC of $1.5 billion upon closing the Transaction,[189] (b) RBC's $3.2 billion participation in a syndicate to provide $12.875 billion of new loans to Brookfield to fund the Transaction,[190] and (c) RBC's equity stake in Brookfield;[191] (3) Fukakusa's son was a vice president of RBC;[192] and (4) she was indebted to Brookfield for helping her to secure her position as Chancellor at Ryerson University.[193]

Fukakusa's previous employment at RBC is unremarkable, as the Complaint makes clear she joined the GGP Board only after retiring from RBC in January 2017—months before GGP began negotiations with Brookfield.[194] The same can be said for Fukakusa's son working at RBC, as there is no allegation that he had any involvement in, or retained any ancillary benefit from, the Transaction.

---

[188] Compl. ¶ 30.

[189] Compl. ¶¶ 14, 30, 41, 124, 129, 146, 178.

[190] Compl. ¶¶ 14, 41, 122–23, 146.

[191] Compl. ¶ 41.

[192] Compl. ¶¶ 14, 124, 146, 236.

[193] Compl. ¶ 132.

[194] *Id.*; *see also* Pls.' Answering Br. at 56; Proxy at 247.

Plaintiffs' assertion that Fukakusa was dominated by Brookfield with respect to the Transaction on account of her financial ties to RBC similarly land beyond the bounds of reasonable conceivability. RBC is not a party to the Transaction. Rather, it served as one of several lenders in connection with the deal, and there are no allegations regarding how much RBC stood to earn from the Transaction. Plaintiffs thus ask the Court to infer that RBC's role in the Transaction as lender, combined with its relatively small stockholdings in Brookfield, would increase RBC's market value to an extent so material to *Fukakusa* that she would be rendered unable to "perform her fiduciary duties" on behalf of GGP stockholders.[195] While it is conceivable a director could be beholden to a controller by virtue of her embedded relationship to a lender of the controller,[196] Plaintiffs fail in my view to plead

---

[195] *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999); *see also Orman v. Cullman*, 794 A.2d 5, 25 n.50 (Del. Ch. 2002) (explaining that, absent a director standing on both sides of a transaction, materiality allegations are required to establish lack of independence or a disabling interest). Plaintiffs emphasize that this court observed in the 220 Decision that RBC "stood to receive a substantial benefit" from the Transaction. 220 Decision at 954. But in the context of plenary litigation, it is black letter Delaware law that Plaintiffs must allege facts from which the Court can reasonably infer a material benefit to an interested director, *i.e.*, an alleged benefit "significant enough in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties to the . . . shareholders without being influenced by her overriding personal interest." *Orman*, 794 A.2d at 23 (cleaned up).

[196] *See In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *37 (Del. Ch. June 11, 2020) ("[D]efendants fail to cite any authority that requires a director to have a compromising relationship with the controller himself as opposed to a close advisor or other associate.").

sufficient facts allowing an inference that Fukakusa's relationship with RBC was such that Brookfield could pull that lever to overcome her presumptively loyal fiduciary instincts as a GGP director.[197]

Finally, while Plaintiffs assert that "Brookfield paved the way for Fukakusa's chancellorship as a reward for her paving the way for the Transaction,"[198] Plaintiffs conspicuously fail to plead how Brookfield actually possessed the imperium to coerce Ryerson's 24-member board into naming Fukakusa the school's chancellor, much less what specific steps were supposedly taken by Brookfield to deliver that prize.[199] Indeed, Fukakusa served as a member of the Board of Governors of Ryerson University since 2002 and as its chairperson since 2013—many years

---

[197] Plaintiffs rely on *Calesa Associates. L.P. v. American Capital, Ltd.*, to argue that Fukakusa is interested due to her ties to RBC. 2016 WL 770251 (Del. Ch. Feb. 29, 2016). But *Calesa* dealt with directors whose lack of independence was tied to the alleged controller that was *itself financing* the transaction. *Id.* at *1, *12. The company in *Calesa* also acknowledged that the directors' interests were "in addition to or different" than the target's stockholders. *Id.* at *12. The court found such an acknowledgment weighty, observing "it is well-settled that a director is considered interested when [she] will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *Id.* (internal citations and quotations omitted). Here, RBC was not a party to the Transaction, and there is no acknowledgment from GGP or otherwise that Fukakusa received any nonratable benefit from the Transaction based on her ties to RBC.

[198] Pls.' Answering Br. at 58–59.

[199] *See* Board Members 2019-2020, RYERSON UNIV., https://www.ryerson.ca/governors/members/ (last visited May 10, 2021); *see also* Compl. ¶ 132(a), (b), (d) (citing Ryerson's website three times).

before she joined GGP's Board.[200] Her selection as chancellor of Ryerson was announced two months *before* the Transaction (after more than a decade-and-a-half of board service), and there is no allegation that such a position resulted in any extra compensation, let alone that such compensation was material. Fukakusa's connection to Brookfield through Ryerson is therefore a far cry from Plaintiffs' favorite case on this issue, *In re Oracle Corp. Derivative Litigation*,[201] where the members of the Special Litigation Committee were Stanford professors asked to investigate claims against another Stanford professor and two well-known Stanford benefactors.[202] In totality, Plaintiffs' allegations with respect to Fukakusa fail to support a reasonable inference that Brookfield dominated and controlled the Special Committee's consideration of the Transaction.

---

[200] Compl. ¶ 132(c).

[201] 824 A.2d 917 (Del. Ch. 2003).

[202] *Id.* at 943. I note that our Supreme Court has cautioned against applying *Oracle*, decided in the special litigation committee context, as a yardstick for measuring independence of board members in other contexts. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1055 (Del. 2004). Plaintiffs also lean for support on *Delaware County Employees Retirement Fund v. Sanchez*, but the director and Chairman (who was interested in the subject transaction) were alleged to be close friends for five decades, with the director's personal wealth "largely attributable to business interests over which Chairman Sanchez has substantial influence," a favor returned by, among other gestures, the director's maxed-out $12,500 donation to the Chairman's campaign for governor of Texas. 124 A.3d 1017, 1020–21 (Del. 2015). No comparable facts are pled here.

Even assuming the constellation of allegations levelled against Fukakusa rendered her incapable of considering the Transaction impartially, Plaintiffs have not even *attempted* to connect Fukakusa's alleged ties with Brookfield to any actions she took to influence the Special Committee or Audit Committee's process to favor Brookfield.[203] As noted, an inference of transaction-related control must be supported with well-pled allegations that the compromised Special Committee member somehow exercised influence over a majority of otherwise disinterested and independent members.[204] There are no such allegations here.

Perhaps recognizing the fallibility of their challenges to the Special Committee's process, Plaintiffs attempt to supplement their claim that Brookfield actually controlled GGP in the Transaction by reference to several supposed circumstantial markers of control. *First*, Plaintiffs point out Brookfield co-authored, co-filed and co-signed the Proxy.[205] But Plaintiffs cite no authority for the

---

[203] The Court cannot reflexively credit Plaintiff's conclusory allegation that "Fukakusa's participation in the Special Committee tainted the sale process," but instead must evaluate the underlying allegations supporting that conclusion. Compl. ¶ 146; *see Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009) (explaining the court will not accept "conclusory allegations unsupported by specific facts").

[204] *See Cede & Co.*, 634 A.2d at 363 ("This Court has never held that one director's colorable interest in a challenged transaction is sufficient, without more, to deprive a *board* of the protection of the business judgment rule presumption of loyalty."); *Nguyen v. Barrett*, 2016 WL 5404095, at *5 n.46 (Del. Ch. Sept. 28, 2016) (same).

[205] Compl. ¶ 329.

proposition that a co-authored proxy is somehow offensive under Delaware law, and I cannot surmise any reason why that fact would support a reasonable inference of control or impropriety.

*Second*, Plaintiffs allege "BPY took control of the narrative, issuing press releases when GGP and the Special Committee did not," pointing, by way of example, to Brookfield's announcement of the 2017 Offer and then GGP's rejection of that offer.[206] Again, Plaintiffs cite no authority that would support the proposition that a potential acquirer's effort to take control over the public narrative of its negotiations with a target somehow supports an inference that the acquirer actually controls the target, and I am not persuaded that it does.

*Third*, Plaintiffs allege GGP's concession to the suite of deal protections in the Merger Agreement allows an inference that Brookfield dominated and controlled the GGP fiduciaries who agreed to these fundamentally lopsided terms.[207] To be

---

[206] Pls.' Answering Br. at 63 (emphasis omitted); Compl. ¶¶ 153, 156; *see also* Compl. ¶ 283.

[207] Compl. ¶¶ 177–90. In this regard, among other "deal protections," Plaintiffs reference in their Complaint a "poison put," purportedly contained in "the RBC Loan Agreement"— a capitalized term that never reappears either in Plaintiffs' Complaint or briefing—which allegedly provided that "if anyone other than Brookfield acquired more than 50% of GGP's outstanding voting power, the loan went into default and became due, requiring the immediate payment of the $1.4 billion credit facility." Compl. ¶ 178. Consistent with the long-on-rhetoric-short-on-substance theme running through Plaintiffs' claims, and notwithstanding a Complaint numbering many hundreds of paragraphs, Plaintiffs offer no further detail on the loan: there is no mention of what specifically the agreement says, when it was entered or by whom. Plaintiffs never cited to an exhibit in their discussion of the

sure, the coercive effects of deal protection devices are always important and they must be measured against the inferences asked to be drawn from them.[208] But this court has long recognized that non-solicitation provisions, information and matching rights provisions, and termination fees of less than 3% of the transaction price are not particularly remarkable in the realm of arms-length mergers and acquisitions.[209] While Plaintiffs attempt to attribute the lack of competing bidders to these customary "deal protection" provisions, the only reasonable inference to be drawn is that other

poison put, and there are no exhibits on record reflecting a loan agreement between GGP and RBC. Plaintiffs suggest in briefing the loan agreement was negotiated as a part of the Merger Agreement, but it does not appear to be mentioned in the Proxy and Plaintiffs do not take issue with the Proxy's disclosures in that regard. *See* Pls.' Answering Br. at 35–36 (listing the poison put among the deal-protection devices "employed" by the Merger Agreement); *see also* Proxy at 34–38, 151, 226–27 (disclosing other deal-protection devices but making no mention of a poison put). The Court is thus left without pled facts from which to draw any inference regarding a poison put-related "deal protection" much less fiduciary impropriety related to that provision. After dedicating significant time to searching the Complaint, briefs and record for a better understanding of this "poison put," I must conclude that this allegation is a distraction that does not meaningfully impact the Court's analysis.

[208] *See Toys "R" Us*, 877 A.2d at 1016.

[209] *See, e.g.*, *In re 3COM S'holders Litig.*, 2009 WL 5173804, at *7 (Del. Ch. Dec. 18, 2009) (denying expedition under "colorability" standard and explaining that a non-solicitation provision, matching rights provision, and termination fee of over 4% of equity value, even where the directors did not attempt to solicit other buyers before executing the merger agreement, are "standard merger terms"); *see also In re TriQuint Semiconductor, Inc. S'holders Litig.*, 2014 WL 2700964, at *3 (Del. Ch. June 13, 2014) (denying expedition and explaining that non-solicitation provision, matching rights provision, and 2.8% termination fee are "familiar and generally permissible merger agreement provisions").

52

suiters did not emerge because none were interested. Indeed, Goldman "had several discussions with management representatives of . . . GGP's competitors . . . none of which expressed any interest or ability to pursue an acquisition of GGP."[210] Brookfield, for its part, also attempted but failed to solicit co-investors.[211]

---

[210] Proxy at 71. While Plaintiffs allege Goldman and Simpson Thacher were "preordained" by Brookfield, and therefore conflicted, they allege no well-pled facts to support that inference. *See* Compl. ¶¶ 144, 159, 164. The advisors' presence at the Special Committee's first meeting is unsurprising given Plaintiffs' pleading that Kingston had, on Brookfield's behalf, informed the soon-to-be Special Committee chair Hurwitz of the incoming bid prior to the 2017 Offer. Compl. ¶ 136. Further, it is undisputed that the Special Committee had power freely to select its own advisors and, according to the relevant Board resolutions and Proxy, did, in fact, select both advisors based on their substantial experience and their independence from GGP and BPY. Proxy at 60–61; Miller Decl. Ex. 16 (Nov. 12, 2017 Minutes of the Board of Directors) (explaining advisors "present by invitation"). Plaintiffs allege no facts from which the Court can infer that Brookfield was somehow involved in this selection, either through early involvement in the Special Committee or past relationships with either firm. Plaintiffs also take issue with Goldman's financial incentives, noting that the financial advisor would receive a fee only if the deal closed. But Plaintiffs admit, as they must, that contingent fees charged by investment bankers do not alone create disabling conflicts. *See In re Smurfit-Stone Container Corp. S'holder Litig.*, 2011 WL 2028076, at *23 (Del. Ch. May 20, 2011), *as revised* (May 24, 2011); *see also Saba Software*, 2017 WL 1201108, at *21. Plaintiffs have not well pled that GGP's advisors acted in any manner that might reveal a lack of loyalty to GGP, much less in a manner that would facilitate BPY's domination and control over GGP's sales process. The best Plaintiffs can do is allege in conclusory terms that Goldman's price target was "artificially low." Compl. ¶ 162. They plead no basis for the Court reasonably to make that inference other than charted price target comparisons from a Goldman analyst which were from a "prior recent report" and "unrated" following the announcement of the Transaction. *See* Compl. ¶¶ 161–62. Plaintiffs' allegations in this regard are precisely the sort of "hindsight quibbles" over a financial advisor's allegedly "artificially low projections" that have no bearing on any issue that might be relevant in a fiduciary duty analysis. *See In re Novell Inc. S'holder Litig.*, 2013 WL 322560, at *12 (Del. Ch. Jan. 3, 2013).

[211] Compl. ¶ 16. While Plaintiffs allege in conclusory fashion that Brookfield's unsuccessful solicitation of co-investors "poison[ed] the well," there are, again, no facts pled that any interested bidder was deterred.

Considering these efforts, Plaintiffs' attempt to lay blame for the apparent lack of any modicum of third-party interest in GGP on this banal assortment of garden variety deal protections fails the reasonably conceivable test.[212]  Contrary to Plaintiffs' implied position, Delaware law does not view the M&A market as "comprised of buyers of exceedingly modest and retiring personality, too genteel to make even the politest of uninvited overtures: a cotillion of the reticent."[213]

\*   \*   \*   \*   \*

Plaintiffs have attempted to set a stage for their breach of fiduciary duty claims that has Brookfield, despite its minority ownership stake, playing the role of GGP's controlling stockholder by virtue of its domination over GGP's fiduciaries in the negotiation and approval of the Transaction.  The gambit, of course, is intended to ratchet up the scrutiny under which the conduct of GGP's fiduciaries will be measured.[214]  For reasons just explained, the gambit falls short.

## 2. Brookfield Did Not Actually Control GGP Generally

Even if Brookfield's control over GGP cannot be surmised from the Transaction itself, Plaintiffs maintain they have alleged facts sufficient to support a

---

[212] Compl. ¶¶ 143, 176 (internal quotations omitted).

[213] *Toys "R" Us*, 877 A.2d at 1006.

[214] *See Larkin*, 2016 WL 4485447, at *15 (providing examples in the case law where an alleged controller attempted to exert its coercive influence over a transactional process).

reasonable inference that Brookfield controlled GGP generally. The inquiry of actual control seeks to answer whether, "as a practical matter, [the alleged controller was] no differently situated than if it had majority voting control."[215] "It is impossible to identify or foresee all of the possible sources of influence that could contribute to a finding of actual control."[216] Our Supreme Court, however, has set out various indicia of a stockholder's general control over the board, including a stockholder's ability to:

> (a) elect directors; (b) cause a break-up of the corporation; (c) merge it with another company; (d) cash-out the public stockholders; (e) amend the certificate of incorporation; (f) sell all or substantially all of the corporate assets; or (g) otherwise alter materially the nature of the corporation and the public stockholders' interests.[217]

Plaintiffs' case for general control is premised on a constellation of facts they maintain circumstantially allow an inference that Brookfield dominated the GGP Board. Graded against *Paramount*'s rubric, and even more broadly, Plaintiffs' pleading of general control fails.

---

[215] *PNB*, 2006 WL 2403999, at *9.

[216] *Voigt v. Metcalf*, 2020 WL 614999, at *12 (Del. Ch. Feb. 10, 2020) (citing *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *26 (Del. Ch. July 6, 2018), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019) (TABLE)).

[217] *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 43 (Del. 1994).

To start, as this court observed in *Rouse*, an ownership stake approximating Brookfield's 35.3% is "not impressive on its own."[218] Plaintiffs argue Brookfield's right to take its ownership up to 45% under the Standstill Agreement distinguishes this case from *Rouse*. According to Plaintiffs, if one assumes, as this court has, that stockholder "[m]eetings typically attract participation from just under 80% of the outstanding shares,"[219] then it is reasonable to infer that Brookfield's potential 45% vote would easily carry any non-election resolution. By Plaintiffs' lights, Brookfield's contractually-reserved right to vote 10% of all outstanding GGP shares in directors' elections further bolstered its influence, especially where, as here, there were no staggered terms and every GGP director seeking re-election stood for a vote annually.[220] They point to cases like *Voigt v. Metcalf* to argue that this math, alone, supports the inference that Brookfield was a controller as a matter of Delaware law.[221]

Plaintiffs are wrong. Far from dispositive, this court's evaluation of a blockholder's voting power based on hypothetical voter turnout has, since its genesis, been merely one of a mix of factors to be considered in the controlling

---

[218] *Rouse*, 2018 WL 1226015, at *18.

[219] *Voigt*, 2020 WL 614999, at *18.

[220] Compl. ¶ 100.

[221] *See* Pls.' Answering Br. at 64 (citing *Voigt*, 2020 WL 614999).

stockholder analysis.[222]  While judges certainly should be, and are, mindful of the practical reality of an alleged controller's voting power, a 35.3% equity stake does not transmogrify a minority blockholder into a controlling stockholder (with the accompanying fiduciary duties to match).[223]  No amount of mental or mathematical gymnastics can establish controllership by metaphysically stretching one-third into more than one-half.

While this court has certainly scrutinized voting control under the hypothetical assumption that voter turnout is rarely (if ever) 100%,[224] the practical

---

[222] *See Voigt*, 2020 WL 614999, at *17–18 (noting that "the interaction of block size *with other factors* prevents clear patterns [of the relationship between the size of an alleged controller's equity stake and an inference of actual control] from emerging." (emphasis added)); *see also Crimson*, 2014 WL 5449419, at *10 (reviewing a non-exhaustive list of ten significant cases and concluding there was not "any sort of linear, sliding scale approach whereby a larger share percentage makes it substantially more likely that the court will find the stockholder was a controlling stockholder.").

[223] Though GGP's 10-K filings disclose the impact of BPY's minority holdings, they are not substantively different than the disclosures held in *Rouse* as insufficient to support an inference of control.  *Compare* Compl. ¶¶ 109–12 (quoting GGP's Form 10-K) *with Rouse*, 2018 WL 1226015, at *19 (citing cases and finding disclosure that "our substantial stockholder may exert influence over us that may be adverse to our best interests and those of our stockholders" to be a "far cry from the outright admission that a minority blockholder was the corporation's 'controlling stockholder'").  And while the 220 Decision inferred in the context of its proper purpose inquiry that "Brookfield was a *de facto* controller" from the 10-K filings and Brookfield's stock ownership, in addition to its right to appoint three directors to GGP's nine-member board, the court expressly distinguished *Rouse* based on the fact that "*Rouse* was a plenary litigation involving breach of fiduciary duty claims, whereas this case involves a mere Section 220 demand with a significantly lower burden."  220 Decision at 953, n.85.

[224] *See Cysive*, 836 A.2d at 552 n.30; *see also Voigt*, 2020 WL 614999, at *18.

reality of this Transaction is that 88% of the outstanding shares voted in consideration of it.[225] After backing out Brookfield's vote, an overwhelming majority of GGP's shares voted in favor of the Transaction.[226] Indeed, even if Brookfield had voted its entire stake *against* the Transaction, the Transaction *still* would have been approved by a majority of GGP stockholders.[227]

The fact that Brookfield could have increased its ownership to 45% does nothing to change the calculus. According to Plaintiffs, this fact somehow increases the likelihood that GGP fiduciaries would fear that Brookfield might throw its weight around to their detriment. But our law is not concerned with the mere "potential" that a stockholder might increase its stockholdings and thereby increase its influence; under that standard, any stockholder of means could, at the pleading stage, be saddled with fiduciary duties based purely on its ability to acquire a sufficiently large enough stake in the target to raise an inference of minority

---

[225] Form 8-K at Item 5.07 (disclosing 958,392,649 shares of GGP's common stock were outstanding and 849,896,012 shares were represented in person or by proxy at the special meeting).

[226] *See id.*

[227] This fact distinguishes this case from *Ross v. Lineage Cell*, C.A. No. 2019-0822-AGB (Del. Ch. Sept. 21, 2020), D.I. 56 (TRANSCRIPT). *Ross* is further distinguishable in that the court there expressed concern about decidedly low voter turnout (a non-issue in this case). *Id.* at 11–12.

blockholder control.[228]  The question, rather, is whether it is reasonably conceivable

that Brookfield was, at the time of the Transaction, a controller.  Plaintiffs do not

allege Brookfield ever made any retributive threats against GGP fiduciaries, either

overtly or implicitly through conduct.[229]  Simply put, there is no pled basis to infer

that Brookfield exerted any influence over GGP fiduciaries such that they would

"defer to [Brookfield] because of its position as a significant stockholder" rather than

exercise their own independent business judgment.[230]

To be sure, Brookfield had a right under the Investment Agreement to

designate three nominees for election to the Board, so long as it owned at least 20%

of GGP's stock.[231]  But Brookfield had only one representative on the consequential

three-member N&G Committee and Plaintiffs do not challenge the independence of

---

[228] *See In re Sea-Land Corp. S'holders Litig.*, 1987 WL 11283, at *5 (Del. Ch. May 22, 1987) (rejecting a plaintiff's claim that a 39.5% minority blockholder was a controlling stockholder because, while the blockholder's holdings perhaps "had the potential ability to frustrate a competing bid," under Delaware law "the *potential* ability to exercise control is not equivalent to the actual *exercise* of that ability." (citation omitted)); *see also Citron v. Steego Corp.*, 1988 WL 94738, at *6 (Del. Ch. Sept. 9, 1988) ("Delaware law is well developed on this point[:] . . . While a position less than a majority stockholding might, as a factual matter, give rise to control which, in turn, gives rise to a fiduciary duty, it is the actual exercise of such control, not the simple potential for control, that creates the special duty." (internal citations omitted)).

[229] *See* Pls.' Answering Br. at 65.

[230] *Lynch*, 638 A.2d at 1115.  *See also Rouse*, 2018 WL 1226015, at *18–20 (finding that plaintiff had failed to plead facts supporting an inference that a minority blockholder exercised actual control over the target).

[231] Inv. Agreement § 5.10(a)(ii).

59

the other two members.[232]  Contrary to Plaintiffs' conclusory allegation, Brookfield could not impose its will on this important governance committee when, at best, its preferences were always subject to majority veto.

Further, the Complaint is bereft of allegations that Brookfield had any contractual right "to dictate any action by the board, to veto any action of the board or to prevent the board from hiring advisors and gathering information in order to be fully-informed."[233]  To the contrary, Plaintiffs' allegations detail how Brookfield made every effort to neutralize its influence by entering the Standstill Agreement, which provided Brookfield could not acquire more than 45% of GGP's outstanding

---

[232] *See Rouse*, 2018 WL 1226015, at *14 ("Plaintiffs seem content to ignore that the compensation committee comprised three members, two of whom were unquestionably independent from Brookfield.  Thus, Brookfield had no ability to dictate the terms of Silberfein's compensation.").

[233] *KKR*, 101 A.3d at 994.  Plaintiffs highlight the Complaint's allegations that Brookfield originally nominated or recruited at least seven of the nine GGP directors, all of whom served throughout the Transaction process until closing.  Compl. ¶¶ 27, 36 (Clark), 28 (Fiala), 29, 36 (Flatt), 33, 36 (Kingston), 41 (Haley), 101, (Mathrani) 132 (Fukakusa).  But the fact that a board member was nominated by a stockholder does not cast into question his independence.  *See KKR*, 101 A.3d at 996 ("It is well-settled Delaware law that a director's independence is not compromised simply by virtue of being nominated to a board by an interested stockholder.").  Brookfield could only vote up to 10% of all outstanding common shares of GGP for or against other nominees to the Board.  Compl. ¶ 100.  Plaintiffs argue the apparently meagre 10% voting block is larger than advertised due to GGP's dispersed shareholder base.  But a dispersed shareholder base would appear to empower individual shareholders and dilute Brookfield's ability to recruit a meaningful ally to achieve its agenda.  *Cf. Tesla*, 2018 WL 1560293, at *15 (finding salient a minority blockholder's ability to "rally other stockholders").  Regardless, Plaintiffs cannot be heard to argue 10% of a vote could dictate the outcome of a director's election.

60

stock without approval by both a majority of disinterested GGP directors and a majority of GGP stockholders unaffiliated with Brookfield.[234] Brookfield thus could not unilaterally acquire sufficient stock to dictate the outcome of a director's election.[235] It further ensured GGP's independence through several provisions:

- Section 1.1(a) required GGP to have a majority of "independent" directors under the NYSE Rules;
- Section 1.1(b) required a majority of the Nominating and Governance Committee to be "disinterested directors" unaffiliated with Brookfield;
- Section 1.1(c) required that, for the election of directors other than Brookfield's nominees, Brookfield must vote any shares it held in excess of 10% of GGP's outstanding stock in proportion to the votes cast by GGP stockholders unaffiliated with Brookfield; and
- Sections 1.1(e)–(f) required that any transaction involving GGP proposed by Brookfield or in which Brookfield would receive disparate consideration be approved by a majority of "disinterested directors" and GGP stockholders unaffiliated with Brookfield.[236]

This "bevy of contractual restrictions [that] constrained [Brookfield] from control of [GGP] . . . prohibit[] a pleading stage inference of control."[237]

Plaintiffs' final attempt to plead that Brookfield actually controlled GGP rests upon Brookfield's role in shaping GGP into what it was at the time of the

---

[234] Standstill Agreement §§ 2.1(a), 4.1(x); Proxy at 144.

[235] *See* Miller Decl. Ex. 14 (GGP Certificate of Incorporation) Art. VI, ¶ C.

[236] Standstill Agreement §§ 1.1(a)–(f). As noted, GGP's Related Party Transaction Policy also required that any transaction with Brookfield be approved by GGP's Audit Committee before being submitted to the Board for consideration. Compl. ¶ 191.

[237] *Sciabacucchi*, 2017 WL 2352152, at *17–18.

Transaction. Specifically, the Complaint recites the story of how Brookfield's rescue of GGP out of bankruptcy "without the dishonor of default" led GGP and its fiduciaries to operate under a sense of owing and gratitude toward their redeemer.[238] Plaintiffs cite *In re Tesla Motors, Inc. Stockholder Litigation* by way of analogy,[239] where the court relied on the well-pled allegations of the blockholder's history of support "in hard times" when the firm was "on the ropes" to support a finding that it was reasonably conceivable that Tesla's founder and CEO Elon Musk controlled the company.[240]

Plaintiffs are correct that the court in *Tesla* pointed in passing to Musk's early and necessary support of Tesla when addressing plaintiffs' allegations that Musk was Tesla's controlling stockholder. But that fact, alone, was hardly dispositive. The *Tesla* plaintiffs pled much more, including Musk's ability to rally other stockholders to follow his initiatives, his alleged history of dominating the Tesla board, his dominating role in directing Tesla policy and strategy, and Tesla and Musk's own acknowledgement of Musk's control.[241] None of those facts have been pled here. Indeed, unlike *Tesla*, the Board signaled its independence from

[238] Compl. ¶¶ 83–99.

[239] 2018 WL 1560293 (Del. Ch. Mar. 28, 2018).

[240] *Id.* at *16.

[241] *Id.* at *14–19.

Brookfield by forming a well-functioning Special Committee promptly after receiving Brookfield's offer and excluding from deliberations of the Transaction all Brookfield-affiliated directors.[242] Without well-pled facts supporting an inference that an alleged controller's financial support weighed on the minds of a company's directors, this factor has no significance in the outcome of the controller inquiry.

*In re Cysive, Inc. Shareholders Litigation*[243] has been characterized as the historical "benchmark for the minimum degree of managerial clout needed to meet the actual control test where the alleged controller's holdings are well below 50% of a company's outstanding shares."[244] In *Cysive*, then-Vice Chancellor Strine found the stockholder held "day-to-day managerial supremacy" over the company where: (1) he served as "Chairman and CEO of Cysive, and a hands-on one, to boot"; (2) "by admission [he was] involved in all aspects of the company's business, was the company's creator, and . . . its inspirational force"; and (3) two "close family

---

[242] *See id.* (noting the complaint well pled Musk played an integral role in Tesla's success, "brought the [acquisition] proposal to the Board not once, not twice, but three times. . . . [T]he Board never considered forming a committee of disinterested, independent directors to consider the *bona fides* of the Acquisition" notwithstanding the "obvious conflicts of its members.").

[243] 836 A.2d 531 (Del. Ch. 2003).

[244] *Larkin*, 2016 WL 4485447, at *14; *see also Morton's*, 74 A.3d at 65 (characterizing *Cysive* as the "most aggressive finding that a minority blockholder was a controlling stockholder"); *but see Rouse*, 2018 WL 1226015, at *19 n.163 (noting "[i]t is likely that more 'aggressive' examples can be found in our post-*Cysive* case law, but *Cysive* is still generally regarded" as an aggressive example of our controller jurisprudence).

members" of the controller served in executive positions.[245] Evidence of managerial clout, combined with the stockholder's "unified voting coalition" totaling 40% of the company's voting stock, drove the court in *Cysive* to conclude it was reasonably conceivable that the minority stockholder was actually a controller.[246] There are no comparable allegations of Brookfield's "managerial supremacy" over GGP. The best Plaintiffs can muster is the fact that a Brookfield-affiliated director held the position of Chairman at the time of the Transaction.[247] This fact alone, however, does not move the needle, as Plaintiffs have not pled how any other facts demonstrate Brookfield exercised managerial supremacy over the day-to-day affairs of GGP or general control over the Board.

\* \* \* \* \*

For reasons just stated, I have determined that Brookfield was not a controlling shareholder of GGP at the time of the Transaction. That finding has two consequences. First, neither Brookfield nor any Brookfield-affiliated Defendant owed fiduciary duties to GGP's shareholders, and so Count I alleging breach of fiduciary duty against BPY must be dismissed. Counts III and IV must also be

---

[245] *Cysive*, 836 A.2d at 552.

[246] *See id.* at 551–52.

[247] Pls.' Answering Br. at 67.

64

dismissed as to BPY, as they are both predicated on the existence of BPY's fiduciary duties.

Second, *Corwin* applies because the Transaction did not involve a conflicted controller.[248]  Plaintiffs planned for this contingency, arguing that, even under *Corwin*, the Transaction cannot be blessed on the pleadings because stockholder approval was uninformed and coerced.  I take up that issue now.

## B. Stockholder Approval Was Fully Informed and Uncoerced

Our Supreme Court affirmed in *Corwin* that, "when a transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies."[249]  "Thus, in the absence of a controller, to avoid the application of the business judgment presumption under *Corwin*, a plaintiff must well-plead that the stockholder vote

---

[248] *See In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at *13 (Del. Ch. Aug. 31, 2020).  While not necessary to the outcome, even if I had concluded that Plaintiffs had well pled Brookfield was GGP's controlling stockholder, I would have landed at business judgment review in any event given that all involved in the Transaction followed the *MFW* roadmap as later refined by our Supreme Court in *Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018).  "[B]efore the start of substantive economic negotiations," the parties to the Transaction agreed to and then implemented a process whereby the Transaction was negotiated by an independent, well-functioning Special Committee and then subjected to approval by a majority of GGP's unaffiliated, fully informed, uncoerced stockholders. *See id.* at 760.

[249] *Corwin*, 125 A.3d at 309.

approving a transaction was either coerced or uninformed."[250]  Plaintiffs have failed

to invoke either basis to avoid *Corwin*.

### 1. The Stockholder Vote Was Informed

Delaware law requires directors soliciting stockholder action to "disclose fully

and fairly all material information within the board's control."[251]  When a

stockholder alleges that disclosures relating to a solicitation of stockholder approval

were inadequate, "[t]he essential inquiry is whether the alleged omission or

misrepresentation is material."[252]  Information is "not material simply because [it]

might be helpful."[253]  Rather, information related to a stockholder vote is material

only if "there is a substantial likelihood that a reasonable shareholder would consider

it important in deciding how to vote."[254]

A majority of voting shares unaffiliated with Brookfield voted to approve the

Transaction;[255] Plaintiffs allege that this vote was uninformed.  To sustain their

burden to support that conclusion with well-pled facts, Plaintiffs must allege

---

[250] *Rouse*, 2018 WL 1226015, at *21.

[251] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

[252] *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *9 (Del. Ch. Jan. 5, 2017).

[253] *Skeen v. Jo–Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000).

[254] *Saba Software*, 2017 WL 1201108, at *8 (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)).

[255] Form 8-K at Item 5.07.

"a [material] deficiency in the operative disclosure document, at which point the burden would fall to defendants to establish that the alleged deficiency fails as a matter of law in order to secure the cleansing effect of the vote" under *Corwin*.[256]

Plaintiffs take to a kitchen sink approach to meeting their burden, enumerating a laundry list of purportedly "material" facts omitted from, or misleadingly described in, the Proxy. Most of Plaintiffs' disclosure claims are obviously deficient and can be disposed of quickly. Others require more intensive review. For reasons explained below, I find all fall short.

### a. The Five-Minute Audit Committee Meeting

The Audit Committee was charged with meeting to consider the proposed Transaction in accordance with GGP's Related Party Transaction Policy, which prohibited any transaction between Brookfield and GGP unless the Audit Committee "determines the transaction is on terms comparable to those that could be obtained in arm's length dealings with an unrelated third party."[257] Plaintiffs contend the Proxy should have disclosed that the Audit Committee's meeting to approve the Transaction lasted a mere five minutes. Plaintiffs assert that a reasonable GGP stockholder would have wanted to know that an Audit Committee charged with "the

---

[256] *Solera*, 2017 WL 57839, at *8.

[257] Compl. ¶ 191; Proxy at 79.

67

most germane and complex task in the entire process" took so little time to deliberate.[258]

I disagree. The Audit Committee was comprised of Fukakusa, Haley and Hurwitz.[259] Each of these three directors served on the Special Committee that had negotiated the Transaction throughout a process that lasted several months. Each were intimately familiar with the Transaction and its history. The fact that they met for only five minutes when they took their Special Committee hats off and put their Audit Committee hats on is not at all surprising. To have disclosed that fact, in these circumstances, would not have informed stockholders; it would have misled them.[260]

### b. The Potential Impact of TCJA on the Value of GGP Stock

Plaintiffs argue that the Proxy failed sufficiently to disclose material facts concerning the TCJA.[261] More specifically, Plaintiffs characterize the Proxy's disclosures regarding the TCJA's effect on the value of BRP REIT (the "give") as "faulty and inadequate," and make much of the fact that the Proxy makes no disclosures at all regarding the statute's effect on the value of GGP (the "get"), also

---

[258] Pls.' Answering Br. at 153.

[259] Compl. ¶ 193.

[260] *See Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *12, n.119 (Del. Ch. Nov. 30, 2007); *McMillan v. Intercargo Corp.*, 1999 WL 288128, at *9 (Del. Ch. May 3, 1999).

[261] Compl. ¶¶ 248–60.

68

a REIT.[262]  According to Plaintiffs, these facts would have been material to stockholders, each of whom "had to decide whether to vote to surrender their GGP shares, and every one not choosing appraisal had to decide whether the equity portion of their consideration would be a U.S. REIT (BPR REIT) or a Bermuda-based non-REIT (BPY)."[263]

Plaintiffs' theory ignores that the Proxy expressly directed stockholders to consult their tax advisors on the impact of tax rules on the Transaction specifically and the ownership of stock in a REIT generally.[264]  The Proxy also expressly addressed how the TCJA might affect BPR and its taxable REIT subsidiaries under the heading "MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS AND CONSEQUENCES."[265]  It warned expressly, *inter alia*, that "[t]he effect of

---

[262] Pls.' Answering Br. at 155.

[263] *Id.*

[264] Proxy at 9 ("**THE U.S. FEDERAL INCOME TAX RULES APPLICABLE TO THE TRANSACTIONS AND TO THE OWNERSHIP OF STOCK OF [REITS], AND BPY UNITS GENERALLY ARE HIGHLY TECHNICAL AND COMPLEX. HOLDERS OF SHARES OF GGP COMMON STOCK AND HOLDERS OF BPY UNITS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE SPECIFIC TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS, THE OWNERSHIP OF CLASS A STOCK, AND BPR'S QUALIFICATION AS A REIT FOLLOWING THE MERGER, AND THE OWNERSHIP OF BPY UNITS, INCLUDING THE APPLICABILITY AND EFFECT OF U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX LAWS, AND POTENTIAL CHANGES IN APPLICABLE TAX LAWS, IN LIGHT OF THEIR PARTICULAR CIRCUMSTANCES.**" (all caps and emphasis in original)).

[265] *Id.* at 196–97.

the TCJA on BPR and its holders is uncertain, and administrative guidance will be required in order to fully evaluate the effect of many provisions."[266]  Delaware law does not require that fiduciaries soliciting stockholder approval of a transaction confer individualized tax advice.[267]  In this instance, it was more than adequate that the Proxy flagged the issue and suggested that stockholders seek out their own expert advice.

### c.  Disclosures Regarding the "Minority Discount"

Plaintiffs assert that class members receiving either BPY units or BPR REIT stock suffered near-total loss of voting power from the Transaction's creation of different classes of stock.  They contend the Proxy should have, but did not, disclose the resulting potential for a "minority discount," a term which describes an empirically observable phenomenon whereby the presence of a controlling stockholder tends to exert downward pressure on the price of a company's publicly traded stock.[268]

---

[266] *Id.* at 197.

[267] *See Skeen*, 750 A.2d at 1174 (explaining stockholders need not be provided all information allowing for "an independent determination of fair value"); *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *10 (Del. Ch. June 30, 2014); *In re Plains Expl. & Prod. Co. S'holder Litig.*, 2013 WL 1909124, at *10 (Del. Ch. May 9, 2013).

[268] Compl. ¶ 204 (citing Paul Hanouna, Atulya Sarin & Alan C. Shapiro, *Value of Corporate Control: Some International Evidence*, (Marshall School of Bus., Working Paper No. 01-04, 2001).

Contrary to Plaintiffs' characterizations, however, the Proxy contains a 21-page section entitled "Comparison of Rights of Holders of GGP Common Stock, Class A Stock and BPY Units."[269] That section details the "material differences between the rights of GGP common stockholders, holders of class A stock and BPY unitholders under the governing documents of GGP, BPR and BPT,"[270] and provides a comparison of "voting rights," including the differences in number of votes per share and any matters on which those shares would not be entitled to vote.[271] Other sections of the Proxy disclose the impact of the change in voting rights, including that:

> [U]naffiliated GGP common stockholders who receive class A stock following the closing of the Transactions *will have less voting power* over BPR than they did over GGP prior to the closing of the Transactions. Consequently, unaffiliated GGP common stockholders as a group *will exercise less influence over the management and policies of BPY after the consummation of the Transactions than they currently exercise over the management and policies of GGP*.[272]

Defendants thus disclosed expressly that stockholders "will have less voting power over BPR than they did over GGP."[273] They need not have gone further to

---

[269] Proxy at 308–30; *see also* Compl. ¶ 266 n.56 (citing that section of the Proxy).

[270] Proxy at 309.

[271] *Id.* at 310–12.

[272] *Id.* at 150–51 (emphasis added).

[273] *Id.*

71

incant Plaintiffs' preferred magic words ("minority discount") or speculate as to the well-known ways in which a change in control might affect the minority shareholders' stock pricing.[274] The stockholders were given sufficient information to understand the potential imposition of a minority discount and its implications.

### d. Conflicts Between Special Committee Minutes and the Proxy

Plaintiffs offer several examples where the 220 Documents purportedly reveal that the primary official minutes of the Board and Special Committee contradict the Proxy's more detailed recitation of the same events. According to Plaintiffs, the contemporaneously created minutes are the better evidence of what really happened, and stockholders were entitled to know that version of events leading up to the approval of the Transaction. Plaintiffs point to the following examples:

- The Proxy states that the Special Committee retained Goldman (1) following a presentation from Goldman "confirming" the absence of certain conflicts and (2) based on the Committee's assessment that Goldman was "independent[t] from BPY, GGP and their respective management."[275] Plaintiffs highlight that the minutes from the same meetings do not provide an indication that either of these events occurred as described, and do not explain why the Special Committee chose to pay Goldman $30 million on a fully contingent basis.
- The Proxy states that on November 29, 2017, GGP management discussed with the Board GGP's worsening market environment and the Company's

---

[274] *See In re MONY Gp., Inc. S'holder Litig.*, 853 A.2d 661, 682 (Del. Ch.2004) ("[A]s a general rule, proxy materials are not required to state 'opinions or possibilities, legal theories or plaintiff's characterization of the facts.'" (citation omitted)).

[275] Compl. ¶ 271.

revised projections reflecting this worsening environment, yet references to such discussions are entirely absent from the meeting minutes.[276]

- The Proxy notes—without any support in the meeting minutes—that on December 8, 2017, the Special Committee discussed that Brookfield might retain Mathrani post-Transaction (which Plaintiffs assert would objectively conflict Mathrani).[277]
- The Proxy notes—without any support in the meeting minutes—that on February 24, 2018, the Special Committee discussed "negative market conditions" facing GGP.[278]
- The Proxy notes—without any support in the meeting minutes—that the Special Committee discussed due diligence issues and "potential strategies" regarding "potential leaks."[279]
- The Proxy dedicates ten "dense, single-spaced pages" to recounting the Special Committee's and Board's discussions the day of the Merger Agreement's execution, but the minutes "indicate that the March 26 meetings were extremely limited, in scope, depth, and time, with the GGP Board meeting lasting only 15 minutes."[280]

While Plaintiffs misleadingly characterize their nitpickings as "conflicts" between the minutes and Proxy, their argument distills to a concern that the Proxy contains more detail than GGP's minutes. But the purpose of shareholder disclosures is to provide stockholders additional information; if meeting minutes were sufficient to disclose all material facts, then companies would have no need to undertake the significant expense (on stockholders' behalf) to organize and include

---

[276] Compl. ¶ 272.

[277] *See* Proxy at 64; Compl. ¶ 273.

[278] Compl. ¶ 274.

[279] Compl. ¶ 275.

[280] Pls.' Answering Br. at 160 (citing Compl. ¶ 276).

such details in their disclosures. They would simply attach meeting minutes (redacted as appropriate) to their public filings and call it a day. In the real world, meeting minutes need not contain the level of detail contained in a proxy issued to inform stockholders of all material issues related to a transformative transaction. To include such granular detail in meeting minutes, in most cases, would entail a titanic waste of resources by a company owned and run for the benefit of stockholders. Indeed, Plaintiffs admit in briefing that Delaware law imposes no requirement that board minutes be prepared to any specified level of particularity.[281] In any event, I do not find any of the purported "conflicts" raised by Plaintiffs to be material.

### e. Brookfield's Transaction-Related Payments to Mathrani

Plaintiffs argue Defendants breached their duty of disclosure by failing to disclose the details of Mathrani's post-Transaction plans to work as Vice Chairman of BAM and CEO of Brookfield's retail operations. Plaintiffs admit, as they must, that the Proxy discloses that Mathrani's then three-year-old 2015 GGP employment agreement contemplated his receipt of a severance payment if the agreement was

---

[281] *Id.* at 161 (citing *Feuer v. Redstone*, 2018 WL 1870074, at \*14 n.146 (Del. Ch. Apr. 19, 2018) (observing "that there is no requirement under Delaware law that board minutes adopt any level of particularity.")).

terminated "without cause" or for "good reason."[282] It also discloses that Mathrani's new Brookfield employment agreement would go into effect immediately upon completion of the Transaction, with terms comparable to his GGP employment agreement.[283] Plaintiffs take issue, however, with the fact that the Proxy did not disclose whether Mathrani would have been entitled to his severance had he not bargained with Brookfield for this severance payment while still CEO of GGP.

Contrary to Plaintiffs' contentions, the Proxy need not have disclosed Board speculation regarding an irrelevant hypothetical. To assist GGP stockholders in evaluating the merits of the Transaction, the Proxy disclosed that Brookfield determined Mathrani's 2015 GGP employment agreement's severance package was due as part of Brookfield's post-merger employment decisions.[284] That disclosure was sufficient to put shareholders on notice of Mathrani's interest in his severance payment. In any event, Brookfield agreed to pay Mathrani only after the Transaction was negotiated (without Mathrani's involvement) and the Merger Agreement was

---

[282] Compl. ¶¶ 8, 17, 115(d), 116, 247, 311; Proxy at 140–43 ("Under the BAM Employment Arrangement and in connection with the closing of the Transactions, Mr. Mathrani will receive the cash severance provided in the 2015 Employment Agreement for a termination without 'cause' or for 'good reason' . . . .").

[283] Proxy at 142.

[284] *Id.* at 141.

signed.[285]  As such, Mathrani's severance was irrelevant to the stockholder's consideration of the Transaction and need not have been disclosed.

### f. Management's Valuation Theses

Plaintiffs allege that Mathrani at one time advocated "selling off individual [GGP] properties or groups of properties as a way for shareholders to realize far more value than the market afforded," but then "did not object when the GGP Special Committee did not even test such an approach."[286]  They cite our Supreme Court's decision in *Appel v. Berkman* to argue that "[i]t is inherent in the very idea of a fiduciary relationship that the stockholders that directors serve are entitled to give weight to their fiduciaries' opinions about important business matters."[287]  Plaintiffs reason that, just as the Court found in *Appel*, Defendants here devoted "acres and acres of the [Proxy] on identifying the subjective reasons for the transaction, as well as other reasons against it,"[288] and so should have included Mathrani's pre-Transaction valuation thesis.

In the same vein, Plaintiffs argue that BPY's long-time CFO's (Bryan Davis) statement on an investor call that GGP's NAV was estimated to be $30 per share

---

[285] Compl. ¶¶ 7, 115–16.

[286] Compl. ¶ 119.

[287] 180 A.3d 1055, 1062 (Del. 2018).

[288] *Id.* at 1060–61.

should have been disclosed in the Proxy. As support, they cite *Lynch v. Vickers Energy*[289] as "controlling precedent" and argue that the undisclosed information was not, as a matter of law, stale because Davis gave his valuation just before the 2017 Offer was extended.

Plaintiffs' arguments are unpersuasive on both fronts. First, the Complaint and documents it incorporates by reference show Plaintiffs mischaracterize Mathrani's supposed support for a "sell-off-the-parts" strategy based on isolated statements Mathrani made during a 2017 investor call.[290] On that call, Mathrani stated multiple times that "there's no sacred cow" and GGP "will look at all alternatives," including a sale of the Company.[291] Mathrani only described the sell-off-the-parts strategy in the context of illustrating for analysts "a very extreme situation," reiterating in the same breath that he "do[es]n't know the answer" and is simply "trying to demonstrate that if a market doesn't value the real estate, it's our job to make sure that the investors get their appreciation."[292] Plaintiffs concede that this position was widely known in the market.[293] Ultimately, Mathrani appears to

---

[289] 383 A.2d 278 (Del. 1977).

[290] Compl. ¶¶ 69–77, 80, 119, 154, 158, 174, 197.

[291] 2017 Investor Call Tr. at 6, 8, 10.

[292] *Id.* at 13.

[293] Pls.' Answering Br. at 10–11, 134–37.

have decided Brookfield's offer was the best option; this decision is entirely consistent with the position he advertised to stockholders before the Special Committee set about negotiating the Transaction.[294] Thus, Mathrani's purportedly fully-formed (and exclusive) "sell the parts" valuation thesis is a litigation-driven figment of Plaintiffs' imagination that need not have been disclosed in the Proxy.

As for Davis' "valuation," Plaintiffs base their claim on Davis' response to an investor question during the November 2, 2017 earnings call regarding the change in GGP's NAV since Q2 2017.[295] After an analyst suggested that GGP's IFRS NAV "was about $29 a share in Q2," Davis responded "[i]t's about $30 per share [this quarter because] . . . . [w]hat we saw this quarter is just continued pickup of our share of their earnings. And, as a result of that, it ticked up a little bit more than it was in Q2."[296] Unlike *Vickers*, there is no "report" (or any substantive basis) proffered by Plaintiffs from which this Court could infer Davis' answer was anything other than what it appears to be: an off-the-cuff remark in a back-and-forth with an analyst during an earnings call, acknowledging a slight price bump based apparently

---

[294] *See* 2017 Investor Call Tr. at 6, 8, 10 (Mathrani explaining "there's no sacred cow" and GGP "will look at all alternatives," including a sale of the Company).

[295] Compl. ¶ 78.

[296] *Id.*

on a "slightly-better-performance-than-last-quarter" rationale.[297] A company properly excludes from proxy materials any "speculative" or unsettled valuations.[298]

In any event, the gap between GGP's private and public valuation was no secret; indeed, it motivated GGP to explore strategic alternatives, and it no doubt enticed Brookfield into making its 2017 Offer. Moreover, the Proxy addresses the perceived gap between GGP's private and public valuation in its discussion of GGP management's effort to pursue a sale of two GGP properties it believed would serve as "a helpful indication as to the potential private market valuation of other comparable assets in GGP's portfolio," as they "were representative, from a valuation perspective, of GGP's portfolio of Class A retail properties."[299] The Proxy further disclosed that a proposal GGP received in January 2018 on one of its properties was below the sales price capitalization rate authorized by the Board and was not approved by the Board due to a concern it would "put pressure on the net asset value of GGP's portfolio more generally."[300]

---

[297] *See Vickers*, 383 A.2d at 280.

[298] *Clements v. Rogers*, 790 A.2d 1222, 1245–46 (Del. Ch. 2001); *see also In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 200 (Del. Ch. 2007) (rejecting plaintiff's contention that a valuation was material where plaintiff made "no demonstration that this part of [the] estimate was at all reliable").

[299] Compl. ¶ 242 (quoting Proxy at 58–59).

[300] Proxy at 65–66.

Finally, and importantly, neither Mathrani nor Davis are Board members alleged to have *changed* their view on the merits of the Transaction: Mathrani voted in favor of the Transaction, while Davis recused himself early in the process due to his affiliation with Brookfield. This fact distinguishes this case from Plaintiffs' cited authority where courts held as material the reasons for a board member's objection or abstention from a board vote.[301] For these reasons, I find that neither Mathrani's nor Davis' "valuation" remarks were subject to mandated disclosure.

### g. Fukakusa's Conflicts

Plaintiffs next take aim at the Proxy's failure to disclose Fukakusa's conflicts. Plaintiffs admit, as they must, that the Proxy disclosed that (1) Fukakusa was a RBC financial executive for 32 years, 13 as CFO, and that she retired from RBC in 2017, (2) RBC would obtain repayment in the Transaction of its $1.5 billion loan to GGP and (3) RBC would participate in a syndicate providing many billions of dollars in new loans to finance the Transaction. Plaintiffs point out, however, that the Proxy did not disclose the "hard facts" of (4) Fukakusa's interest in RBC equity of C$31–

---

[301] *See Appel*, 180 A.3d at 1057, 1059–64 (holding that board Chairman and founder's abstention from supporting the merger due to disappointment with the price would have been material to a reasonable stockholder); *Chester Cty. Empls.' Ret. Fund v. KCG Hldgs., Inc.*, 2019 WL 2564093 (Del. Ch. June 21, 2019) (holding as reasonably conceivable the materiality of board member and CEO's "objection to the merger price and change of position"); *Gilmartin v. Adobe Res. Corp.*, 1992 WL 71510, at *9–10 (Del. Ch. Apr. 6, 1992) (holding as material "at least two directors . . . believed that this was a bad time to sell Adobe from the perspective of the stockholders due to the depressed gas market; and that they communicated that belief to others on the Adobe board.").

80

41 million, (5) RBC's $8.3 billion ownership of BAM/BPY equity, (6) her 20-year interlocking directorships and collegial relationships with Brookfield at Ryerson, and (7) her son's employment as vice president of RBC (2015–2019) throughout the deal process. Plaintiffs maintain these conflicts were material and argue that Defendants had a duty to disclose all aspects of Fukakusa's conflicts having "traveled down the road of partial disclose."[302]

For reasons explained, however, Plaintiffs fail to allege facts suggesting Fukakusa's interest in RBC or RBC's equity holdings in Brookfield resulted in material personal benefit to a degree that would have divided her loyalties. Plaintiffs also fail to establish the materiality of Fukakusa's son's employment at RBC, as there are no allegations he was involved in, or in any way stood to gain from, the Transaction. As for Fukakusa's connection to Brookfield through Ryerson, the Proxy disclosed her overlapping service on the Ryerson Board with Brookfield executives and, for reasons already explained, Fukakusa's service in that respect cannot reasonably be inferred to compromise her independence from Brookfield.[303] In sum, the Fukakusa/RBC connection was adequately disclosed.

---

[302] *Morrison v. Berry*, 191 A.3d 268, 283 (Del. 2018) (citation omitted).

[303] Proxy at 247, 255. Because I find Fukakusa's service on Ryerson immaterial, the "buried facts" doctrine is not implicated. *See Voigt*, 2020 WL 614999, at *24.

### h. Appraisal

Plaintiffs focus the bulk of their disclosure claim on the way in which Defendants disclosed stockholders' appraisal rights. In this regard, Plaintiffs concede that "[t]he Proxy makes clear that the Transaction did, in fact, trigger appraisal rights under Delaware law."[304] The Proxy further described the mechanics for electing appraisal:

> GGP common stockholders who comply exactly with the applicable requirements and procedures of Section 262 of the DGCL will be entitled to demand appraisal of their shares of GGP common stock (i.e., the dissenting shares) and receive in lieu of the per share merger consideration a cash payment equal to the "fair value" of their GGP common stock, as determined by the Delaware Court of Chancery, which we refer to as the Court of Chancery, in accordance with Section 262 of the DGCL, plus interest, if any, on the amount determined to be the fair value, subject to the provisions of Section 262 of the DGCL.
> [. . .]
> If a GGP stockholder elects to exercise appraisal rights under Section 262 of the DGCL, such GGP stockholder must do ALL of the following: NOT vote such GGP common stock "FOR" the merger proposal; deliver a written demand for appraisal of such GGP common stock that complies exactly with Section 262 of the DGCL before the vote is taken on the proposal to adopt the merger agreement at the special meeting . . .; and continuously hold of record such GGP stock through the effective time of the merger.[305]

---

[304] Compl. ¶ 209.

[305] Proxy at 32, 335–36.

As a predicate to their claim that Defendants committed actionable fiduciary duty breaches by failing adequately to disclose to stockholders the true nature of their appraisal right, Plaintiffs urge the Court to conclude that the Transaction's two-step structure—the payment of the Pre-Closing Dividend followed by a post-closing payout—violated positive law. Specifically, Plaintiffs argue that 8 *Del. C.* § 262 ("Section 262") required Defendants to offer GGP stockholders appraisal for their shares at a pre-Transaction value. By paying the Pre-Closing Dividend separately, Plaintiffs assert Defendants removed almost all value underlying the GGP shares available for appraisal. In this regard, Plaintiffs point to *Louisiana Municipal Police Employees Retirement System v. Crawford* for the proposition that the Transaction's two-step payment structure should be deemed one transaction and, as such, the Pre-Closing Dividend should be deemed consideration paid separate and apart from the "merger consideration."[306] Viewed in this light, the GGP fiduciaries approved a transaction that was designed to deny GGP stockholders the right to seek appraisal for the full pre-Transaction value of their shares as Section 262 requires. Even if the Court finds Defendants technically complied with Section 262, Plaintiffs assert

---

[306] 918 A.2d 1172, 1191–92 (Del. Ch. 2007).

Defendants acted in bad faith by *attempting* to deprive stockholders of their full appraisal rights.[307]

Defendants respond that the Transaction's structure did not violate positive law, as Section 262 grants dissenting stockholders the right "to an appraisal by the Court of Chancery of the fair value of the stockholder's *shares* of stock" at the effective time of the merger; the statute says nothing of a right to an appraisal of the fairness of the merger consideration more generally.[308] Pre-closing dividends in connection with merger transactions are, according to Defendants, unremarkable. Thus, so long as GGP paid the Pre-Closing Dividend to all eligible stockholders, including those who sought appraisal, the Transaction did not violate positive law or notions of equity.

After careful review, I agree with Defendants that the Transaction's structure did not violate Section 262. As an initial matter, the DGCL is an enabling statute designed to apprise those owning and managing corporations what they *can* do with

---

[307] *See Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971) ("Inequitable action does not become permissible simply because it is legally possible."); *see also Bäcker v. Palisades Growth Cap. II, LP*, 246 A.3d 81, 96 (Del. 2021) (applying *Schnell*, holding certain lawful-as-to-form boardroom deceptions constituted bad faith; reaffirming that "director actions are twice-tested, first for legal authorization, and second for equity").

[308] 8 *Del. C.* § 262(a) (emphasis added).

far less emphasis on what they cannot do.[309]   It thus comes as no surprise that Plaintiffs cannot identify any statutory text restricting a buyer's use of a pre-closing dividend in advance of a merger as a means to move consideration from the transacting parties to stockholders.

While Defendants offer no support for their assertion that the Transaction's structure is "common," one of Plaintiffs' favorite cases, *Crawford*, provides an example of a nearly identical deal structure, and the Court has identified others.[310] Plaintiffs' analogy to *Crawford* is otherwise inapt, however, as the court there dealt with a situation where no appraisal rights were granted to dissenting stockholders after an all-cash pre-merger dividend was conditioned on a cashless stock-for-stock merger that would not otherwise have triggered appraisal rights under Section 262. Chancellor Chandler looked past the form of the payment to its substance, holding that the pre-merger dividend required appraisal rights and enjoining the merger until

---

[309] *See Grimes v. Alteon Inc.*, 804 A.2d 256, 266 (Del. 2002) (explaining the DGCL affords corporations "the freedom to enter into new and different forms of transactions"); Leo E. Strine, Jr., *The Delaware Way: How We Do Corporate Law and Some of the New Challenges We (and Europe) Face*, 30 DEL. J. CORP. L. 673, 674 (2005) ("Consistent with a contractarian vision, our statute is, by design, a broad enabling one that permits and facilitates company-specific procedures.  In other words, our statute is much different than one might find in a civil law nation, which would more likely have a prescriptive corporation law chock full of mandatory terms specifying exactly how corporations must conduct their business.").

[310] *Crawford*, 918 A.2d at 1191–92; *In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 729232 (Del. Ch. Mar. 6, 2012); *Hartford's sale of life and annuity lines calls for $300M pre-closing dividend*, Westlaw Mergers and Acquisitions Daily Briefing (Dec. 6, 2017).

the target disclosed that stockholders had the right to dissent and seek appraisal.[311]

Here, there is no dispute that the Proxy disclosed that GGP stockholders had the right to seek appraisal and further disclosed how they should go about exercising that right.

Neither party could identify case law addressing how a pre-closing dividend would (or should) be treated in an appraisal proceeding, but the answer lies in the statute itself at Section 262(h), which directs the Court to value GGP "shares" as if GGP were a going concern "exclusive of any element of value arising from the accomplishment or expectation of the merger," and then empowers the court to "take into account all relevant factors."[312] That language is designed to endow our courts with flexibility, enabling the presiding judge to view the Transaction as a whole in the course of determining GGP's fair value at the time of the merger.[313] The Pre-Closing Dividend would, in my view, qualify as a "relevant factor" in the court's assessment of the fair value of a GGP stockholder's shares.

---

[311] *Crawford*, 918 A.2d at 1191–92.

[312] 8 *Del. C.* § 262(h).

[313] *See Ala. By-Prods. Corp. v. Cede & Co.*, 657 A.2d 254, 258 (Del. 1995) (describing the purpose of appraisal as a "legislative remedy developed initially as a means to compensate shareholders of Delaware corporations for the loss of their common law right to prevent a merger or consolidation by refusal to consent to such transactions." (citing *Schenley Indus., Inc. v. Curtis*, 152 A.2d 300, 301 (Del. 1959) (explaining the appraisal statute "provid[es] for the appraisement of their stock and the payment to them of the full value thereof in money."))).

Thus, a GGP shareholder seeking appraisal could argue, and the Court could determine under Section 262, that the Pre-Closing Dividend plus the closing consideration undervalued the dissenting stockholder's shares. The fundamental issue raised for resolution in the appraisal proceeding would remain unchanged: did the stockholder receive fair value for its proportionate share of the corporation upon closing?[314] If the answer was "no," then the dissenting shareholder would receive an appraisal award that reflected the difference between what she had received in the Pre-Closing Dividend and the adjudicated fair value of her shares. With this in mind, I cannot discern any basis to determine that, by agreeing to structure the Transaction as it did, GGP denied GGP stockholders their right to seek statutory appraisal of their shares. To the contrary, far from a "bad faith" attempt to rob GGP stockholders of appraisal rights, as Plaintiffs put it, GGP stockholders seeking appraisal would appear to be better off with the Pre-Closing Dividend in hand than they would be in the typical case, where a dissenting stockholder must forego all merger consideration in order to perfect her appraisal challenge.

Even assuming the Transaction's structure did not violate positive law, Plaintiffs argue the Proxy failed adequately to disclose appraisal rights under Section 262(d)(1), which requires that companies "notify" stockholders

---

[314] *See Cede & Co.*, 684 A.2d at 296 (Del. 1996); *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1143–44 (Del. 1989).

"that appraisal rights are available . . . ."[315] The problem, say Plaintiffs, is that the Proxy falsely disclosed that stockholders pursuing appraisal would receive a payment of the fair value of their shares "in lieu of the per share merger consideration," as "merger consideration" was an uncapitalized term defined as the post-dividend payment to be made at closing. This disclosure disincentivized stockholders from pursuing appraisal, Plaintiffs argue, by misleadingly implying that *only* the post-dividend payment (comprising a small proportion of the overall consideration) was subject to appraisal.

I disagree. Section 262 requires companies to disclose to shareholders their right to an appraisal of their shares. To that end, GGP disclosed via the Proxy the options available to its stockholders: either (a) accept the post-dividend payment to be made at closing, or (b) forfeit that payment and demand appraisal for a payment equal to the "fair value" of the stockholder's GGP shares. The Proxy then "urged" stockholders to seek out legal advice in considering whether to exercise their appraisal rights, which necessarily would have entailed evaluating the role of the Pre-Closing Dividend on a hypothetical appraisal proceeding.[316] That is all our law requires, as "there is no obligation [under Delaware law] to supply investors with

---

[315] 8 *Del. C.* § 262(d)(1).

[316] Proxy at 336.

88

legal advice"[317] or, relatedly, to engage with legal hypotheticals that are "inherently speculative."[318]

The Special Committee's related disclosures do not change that outcome. Plaintiffs take issue with the Special Committee's statement that dissenting stockholders demanding appraisal would have an "opportunity to have the Court of Chancery determine the fair value of their shares of GGP common stock, which may be more than, less than, or the same as the consideration to be received in the Transactions."[319] Because "Transactions" was defined to include the Pre-Closing Dividend, Plaintiffs quibble that there is an apparent unexplained discrepancy between GGP's and the Special Committee's opinions on appraisal rights as stated in the Proxy. Like its meeting minutes claim, this purported discrepancy is manufactured, as the Special Committee, like GGP, described stockholders' appraisal rights as the right to a determination of "the fair value" of "GGP common

---

[317] *Kahn v. Caporella*, 1994 WL 89016, at *7 (Del. Ch. Mar. 10, 1994) (citation omitted); *see also In re MONY Gp., Inc. S'holder Litig.*, 853 A.2d 661, 682 (Del. Ch. 2004) ("[A]s a general rule, proxy materials are not required to state 'opinions or possibilities, legal theories or plaintiff[']s characterization of the facts.'" (quoting *Seibert v. Harper & Row, Publ'rs, Inc.*, 1984 WL 21874, at *6 (Del. Ch. Dec. 5, 1984))).

[318] *IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *17 (Del. Ch. Dec. 11, 2017); *see also Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *12–13 (Del. Ch. Jan. 25, 1999) (explaining disclosure of a hypothetical "may have made" the proxy "less, not more, reliable"), *aff'd*, 741 A.2d 16 (Del. 1999) (TABLE).

[319] Proxy at 86.

stock."[320]  The additional comment that the Court of Chancery may determine it to be "more than, less than, or the same as the consideration to be received in the Transactions" was not misleading, but merely reflects the unremarkable observation that Section 262 empowers this court to determine fair value and the outcome of the court's adjudicated valuation is difficult to predict *ex ante*.[321]

Certainly, the Proxy could have been more clearly drafted.  For example, the stockholders may have been better served had Defendants capitalized the defined term "merger consideration" and tightened up its definition.  But "perfect" and "sufficient" are two distinct concepts; Delaware's disclosure law concerns itself with the latter.[322]  For the foregoing reasons, I find the Proxy's disclosures concerning appraisal rights were sufficient and therefore reject Plaintiffs' claim that the stockholder vote was uninformed based on the Proxy's disclosure of appraisal rights.

---

[320] *Id.*

[321] Plaintiffs also attempt to draw into the disclosure analysis Goldman's fairness opinion's discussion of "aggregate consideration" and the Election Form's statement that "[a]ppraisal is only available with respect to the Merger Consideration."  Compl. ¶¶ 222–23.  But Goldman's fairness opinion was not proffered to address appraisal rights, and I find it inconceivable that its entirely separate discussion could mislead a reasonable stockholder as to the nature or scope of her appraisal rights.  As for the Election Form, it could not have misled any stockholder into foregoing appraisal because it was disseminated *after* the stockholder vote when the time to seek appraisal had expired.  *See* Election Form.

[322] *Enstar Corp. v. Senouf*, 535 A.2d 1351, 1356–57 (Del. 1987); *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *15 (Del. Ch. June 30, 2014) (no need for "blow-by-blow" disclosures).

### i. "Other" Material Omissions

Finally, at page 162 of Plaintiffs' answering brief, Plaintiffs throw at the wall (under their catch-all "Other" category) several more disclosure violations in hopes that one sticks. According to Plaintiffs, the Proxy should have disclosed: (1) the other deal prospects who were contacted and what deal structure they were shopped; (2) the members or level of management conducting the outreach; and (3) the Board's efforts, if any, to solicit indications of interest in a potential acquisition from third parties. Plaintiffs also contend that the Proxy misleadingly stated that "from [the BPY Press Release to the Merger Agreement]," Goldman "had several discussions with . . . certain of GGP's competitors in the retail property industry"[323] because, in reality, "the universe of prospects is far broader than this tiny pool of candidates."[324]

The different prospects and deal structures proposed by Brookfield and the identity of those involved in Brookfield's or the Board's outreach efforts are precisely the sorts of "bends and turns in the road" or "play-by-play" of the negotiations Delaware law does not require a proxy to disclose.[325] The Proxy

---

[323] Proxy at 71.

[324] Pls.' Answering Br. at 162.

[325] *Globis P'rs*, 2007 WL 4292024, at *14.

91

disclosed GGP management had discussions with third-parties throughout 2017,[326] and that Goldman "had several discussions with management representatives of . . . GGP's competitors . . . none of which expressed any interest or ability to pursue an acquisition of GGP."[327] Further details on the Board's attempt to solicit third-party interest, and Board explanations of its motives when making transaction-related decisions, are precisely the sort of "tell me more" disclosures routinely characterized by Delaware courts as immaterial and unnecessary.[328]

Plaintiffs' unsupported speculation that the universe of transaction prospects was broader than the realm of those actually contacted is conclusory and so cannot be credited. Plaintiffs cite no basis to support an allegation that Goldman cast an unduly small net in shopping GGP. Indeed, the deal's sheer size likely limited the pool of potential bidders capable of marshaling the requisite resources. The limited number of potential suitors is borne out by the record, as bidders were free for months to step forward and take a run at GGP after Brookfield's offer was made public. No one else stepped up. Plaintiffs' "other" disclosure allegations fail as a matter of law.

---

[326] Proxy at 57.

[327] *Id.* at 71.

[328] *See Saba Software*, 2017 WL 1201108, at *9 (collecting cases).

* * * * *

In sum, Plaintiffs have failed to plead facts allowing a reasonable inference that the Proxy was misleading. Accordingly, Count III's claim for the remedy of quasi-appraisal based on the Proxy's mis- or mal-disclosures must be dismissed.[329] And, Plaintiffs are left under *Corwin* to plead the stockholder vote was coerced if they are to avoid business judgment review.

### 2. The Stockholder Vote Was Uncoerced

Under *Corwin*, a stockholder vote will be deemed coerced "[i]f the vote was structured in such a way that the vote may reasonably be seen as driven by matters extraneous to the merits of the transaction."[330] Plaintiffs recycle their disclosure argument to argue the Transaction was coercive as a result of Defendants structuring the merger consideration to remove 98.5% of the deal consideration from appraisal. According to Plaintiffs, this left stockholders with only one choice: vote for the Transaction and accept the merger consideration.[331] Stated differently, Plaintiffs'

---

[329] *See In re Cyan, Inc. S'holders Litig.*, 2017 WL 1956955, at *17 (Del. Ch. May 11, 2017) ("[B]ecause I have concluded that plaintiffs' disclosure allegations are without merit, plaintiffs' request for the remedy of quasi-appraisal based on those allegations must be dismissed as well."); *see also* Compl. ¶¶ 302–07 (Plaintiffs basing their quasi-appraisal claim on disclosures).

[330] *Sciabacucchi*, 2017 WL 2352152, at *2.

[331] Compl. ¶¶ 17–18, 206–34.

theory is that the Transaction's structure was coercive because it "presented appraisal as a non-rational economic choice."[332]

Delaware law has taxonomized various strains of coercion, including inherent, structural and situational coercion.[333] I gather Plaintiffs endeavor to fit their "coercion" claim under the rubric of "structural coercion," which "occurs when the Board structures the vote in a manner that requires stockholders to base their decision on factors extraneous to the economic merits of the transaction at issue."[334] Plaintiffs' attempt to repackage their disclosure claim regarding appraisal rights as structural coercion fails for the same reason the disclosure claim failed. As explained, Section 262's plain text allows a court in an appraisal proceeding to account for the Pre-Closing Dividend in its determination of fair value. I have also determined that the Proxy adequately disclosed to stockholders their right to seek

---

[332] Compl. ¶¶ 17–18.

[333] *See Rouse*, 2018 WL 1226015, at *21 (collecting cases).

[334] *Id.* (citations omitted). "Inherent coercion" is inapt on its face, as it applies to transactions involving conflicted controllers and I have found BPY was not a controlling stockholder. *See In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 438 (Del. Ch. 2002). "'Situational coercion' can arise when the board, by its conduct, creates a situation where 'stockholders are being asked to tender shares in ignorance or mistaken belief as to the value of the shares.'" *Rouse*, 2018 WL 1226015, at *21 (quoting *Next Level Commc'ns, Inc. v. Motorola, Inc.*, 834 A.2d 828, 851 n.90 (Del. Ch. 2003) (internal quotations omitted)). Plaintiffs focus their coercion claim on appraisal rights, not hidden value. While some of Plaintiffs' disclosure claims (*e.g.*, Mathrani's "valuation thesis") arguably fit within the "situational coercion" paradigm, Plaintiffs do not argue those omissions were coercive and, in any event, I have determined such disclosures were not required.

appraisal. There was nothing coercive about the Transaction's structure or the Proxy's disclosure of stockholder appraisal rights.

\* \* \* \* \*

For the foregoing reasons, I am satisfied Plaintiffs have failed to well-plead that the stockholder vote was uninformed or coerced. "[T]he legal effect of a fully-informed stockholder vote of a transaction with a non-controlling stockholder is that the business judgment rule applies and insulates the transaction from all attacks other than on the grounds of waste, even if a majority of the board approving the transaction was not disinterested or independent."[335] As our Supreme Court explained, the "long-standing policy" of Delaware law "has been to avoid the uncertainties and cost of judicial second-guessing when the disinterested stockholders have had the free and informed chance to decide on the economic merits of a transaction for themselves."[336]

No waste has been pled. Accordingly, Counts II (breach of fiduciary duty of loyalty against Director Defendants) and IV (bad faith and breach of the duty of

---

[335] *KKR*, 101 A.3d at 1001; *see also In re Books-A-Million*, 2016 WL 5874974, at \*8 (Del. Ch. Oct. 10, 2016) ("When the business judgment rule provides the operative standard of review, then a court will not consider the substance of the transaction unless its terms are so extreme as to constitute waste."), *aff'd*, 164 A.3d 56 (Del. 2017) (TABLE).

[336] *Corwin*, 125 A.3d at 313.

loyalty concerning Mathrani's Employment Agreement against Mathrani, Brookfield and the other Brookfield Defendants) are dismissed.

## C. Aiding and Abetting

In Count VI, Plaintiffs plead in the alternative that, even if the Court finds Brookfield was not a controller, they have stated a viable claim that Brookfield aided and abetted the Special Committee's breach of fiduciary duties. "To state a claim [of] aiding and abetting, a plaintiff must allege: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."[337] Accordingly, a well-pled claim of breach of fiduciary duty is a predicate to stating an aiding and abetting claim. Having found Plaintiffs have failed to state a claim for breach of fiduciary duty against the Special Committee, it follows Count VI must also be dismissed.

## D. No Unjust Enrichment

In Count V, Plaintiffs allege that Brookfield was unjustly enriched by the Transaction. To obtain restitution for unjust enrichment, "the plaintiffs [must] . . .

---

[337] *Dent*, 2014 WL 2931180, at *17.

show that the defendants were unjustly enriched, that the defendants secured a benefit, and that it would be unconscionable to allow them to retain that benefit."[338]

Plaintiffs' legal theory is that Brookfield was unjustly enriched because the Transaction is the product of a misleading Proxy and conflicts among members of the Audit Committee and Special Committee. Because I have determined Plaintiffs have not adequately pled the Proxy was misleading or that the Audit or Special Committee functioned ineffectively, their claim that Brookfield has been unjustly enriched fails as a matter of law.

## III. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss must be GRANTED.

**IT IS SO ORDERED.**

---

[338] *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999).